United States Court of Appeals
Fifth Circuit

**F I L E D**

**October 27, 2004**

Charles R. Fulbruge III
Clerk

UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT

———————————————

No. 03-30987

———————————————

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

RICHARD E. WALL,

Defendant-Appellee.

———————————————————————————————————

Appeal from United States District Court
for the Middle District of Louisiana

———————————————————————————————————

Before JOLLY, WIENER, and PICKERING, Circuit Judges.

CHARLES W. PICKERING, SR., Circuit Judge:

Before the court is the government's appeal from the district court's order granting

defendant Richard Wall's Fed. R. Crim. P. 33 motion for a new trial. We conclude that the

district court abused its discretion when it granted the motion.

## I. FACTS AND PROCEEDINGS

Wall was indicted on charges of conspiracy involving a scheme to defraud the state of

Louisiana of the proper quality of steel for use in Louisiana Department of Transportation and

Development (LADOTD) road construction projects. Wall was the regional sales manager for

Inland Steel Company. He was charged with one count of conspiracy, eleven counts of mail

fraud, and five counts of making false statements about the quality of steel provided by his

company for highway projects.

The LADOTD maintains a Qualified Products List (QPL) for products that have been tested and approved for use in highway and road construction in Louisiana. This case focuses in particular on QPL 43 and products approved by LADOTD for use as steel culverts. The listing for QPL 43 included information about which companies had been approved to do certain processes on the approved product. Dow Chemical developed a laminate film to be applied to steel coils. Inland Steel manufactured this laminated steel product under the trade name of Blac-Klad. An outside processor, PreFinish Metals, laminated the steel coils for Inland Steel. LADOTD tested and approved Blac-Klad for use in steel culverts on highway projects. In fact, Blac-Klad, manufactured by Inland and laminated by PreFinish Metals, was the only product approved for such use. Caldwell Culvert Company used Blac-Klad, manufactured by Inland and laminated by PreFinish, to fabricate culverts used in highway construction projects in Louisiana.

According to the government, beginning in the late 1980s, Wall conspired with Caldwell's president Bill Lovelace and Caldwell's vice-presidents Keith Wingfield and Don Gee to use a polymer-coated steel product that was not approved by Louisiana. Inland also used an unapproved company, National Galvanizing, to galvanize steel coils that Inland then used to fabricate the laminated steel pipe. Additionally, Inland used an unapproved laminator, ACI, to apply the laminate film to the steel coils. A stencil was applied to these steel coils indicating certain information about the steel, such as the name of the sheet producer, brand name, specified thickness of metallic coated sheet, type of metallic coating, and type or thickness of polymer coating. The parties dispute on appeal whether it was required by LADOTD that the name of the laminator be included on the stencil. Regardless, the government presented evidence at trial

2

indicating that Wall and his co-conspirators agreed to leave the name of the laminator off of the stencil. Presumably this was done because the substitute laminator, ACI, was not approved for laminating steel used in Louisiana highway projects.

The government also presented evidence that Wall and Lovelace conspired to purchase galvanized steel from Wheeling Steel, whose product had failed to meet LADOTD standards, and to have the coils laminated by ACI with the Blac-Klad name stenciled on the steel. The government presented evidence indicating that Caldwell sold over one million pounds of non-conforming culvert pursuant to the conspiracy. The parties further stipulated that Caldwell sold non-conforming culvert for use in Louisiana road projects.

As a result of a federal investigation, Inland project manager Roger McDowell pleaded guilty to misprision of a felony because he failed to report a fraud. Lovelace, Wingfield and Gee pleaded guilty to conspiracy to commit mail fraud.

Wall's trial began on February 25, 2002, and lasted for two weeks. Kirk Clement of the LADOTD testified for the government. According to Clement, Inland's Blac-Klad was the only steel product that met the state of Louisiana's qualifications for laminated steel. He also testified that Wheeling Steel had submitted samples of steel that had not met the state's specifications. Clement inspected steel on highway projects that was marked as Inland steel, but which in fact had been manufactured by Wheeling Steel. Clement communicated with Wall and his office on several occasions regarding Louisiana's specifications for laminated steel and the prohibition against deviating from these standards. After hearing rumors that Inland was using ACI instead of PreFinish Metals to laminate steel, Clement expressed his concerns directly to Wall. Wall reassured Clement that Inland was still using PreFinish as the laminator.

3

James Smith, Inland's Manager of Coated Products, testified that in the late 1980s, Inland began using an outside company, National Galvanizing, to galvanize Inland steel. He testified that Wall was aware of this substitution, which would have been contrary to Louisiana specifications, and that Wall knew of Louisiana's specifications regarding the steel product. He also testified that Wall was aware that Louisiana's specifications required PreFinish Metals to laminate Blac-Klad.

On the third day of trial, Roger McDowell, a former section manager for Inland, testified that Wall and his staff orchestrated the use of ACI to coat steel manufactured by Inland in violation of Louisiana's specifications that approved only PreFinish to laminate the steel. He also testified that Wall conspired to have the stencil on the steel altered. McDowell discussed his concerns with Wall about these deviations and the continued filling of Blac-Klad orders. McDowell testified that he attended a meeting around November 1993 with Wall, William Ristau (the general manager of Inland), and Richard Hartwig (McDowell's supervisor) to discuss these objections. McDowell's testimony regarding this meeting was the focal point of the district court's decision to grant a new trial.

McDowell testified that at this meeting he voiced concerns about the laminator's name being removed from the steel stencil. He further testified that Wall, Ristau, and Hartwig decided to fill Caldwell's order for Blac-Klad without the name of the laminator on the stencil despite McDowell's objections. Some time shortly after this meeting, on November 8, 1993, McDowell drafted a memorandum to Wall, with a copy to Hartwig and others, in which he wrote "[p]er our discussion, Caldwell will accept a deviation to the State of Louisiana specification requiring a processing route of Inland materials through PreFinish Metals. . . The customer [Caldwell] insists

4

that the Blac-Klad coils **DO NOT** reference the new coil coater in our stenciling." (emphasis in original). Defense counsel cross-examined McDowell extensively regarding the alleged meeting and the fact that entries in his daily planner did not mention this meeting.

Bryan Stephens, who worked at Inland's Coated Products Division in the 1990s, testified that Inland used National Galvanizing to galvanize steel and ACI to laminate steel. Stephens also testified that Inland put its name on invoices for steel shipped to Caldwell, although the steel actually had been manufactured by Wheeling Steel. Stephens testified that he had discussions with Wall about using ACI instead of PreFinish because Inland was having difficulty getting Blac-Klad to Caldwell in a timely fashion. According to Stephens, Wall told him that steel would be purchased from Wheeling to meet Caldwell's needs. Stephens testified that Wall had the authority to make this purchasing decision. He further stated that it was common knowledge at Inland that Blac-Klad was the only product approved for Louisiana highway projects.

Bill Lovelace, former president of Caldwell, testified that in approximately 1992, Wall informed him that Inland could no longer galvanize its own steel and that it had begun sending steel to National Galvanizing instead. He further testified that National Galvanizing's product had not been approved by the state of Louisiana. Beginning in 1992-93, Lovelace and Wall discussed PreFinish's unwillingness to continue laminating Inland's Blac-Klad product. Thus, Wall substituted ACI as the laminator in place of PreFinish. When Lovelace asked Inland to take care of the problem with the stencil, i.e. the name of the laminator, he had several discussions with Wall. Wall assured Lovelace that Inland would take care of the stencil problem. Lovelace testified that he and Wall first attempted to purchase steel from Wheeling Steel, but Wheeling refused to sell to Inland. Consequently, Lovelace and Wall arranged to have Caldwell buy its

5

steel directly from Wheeling and send it to Inland. Inland then took the steel from Wheeling and sent it to ACI for lamination. Lovelace testified that Wall knew that the steel in question was intended for use in Louisiana road construction projects and that Wall was familiar with Louisiana's specifications for steel.

Don Gee, a former vice-president for Caldwell, testified that Lovelace and Wall arranged to purchase steel from National Galvanizing to meet Caldwell's demands for steel in the fabrication of culverts for Louisiana highway construction projects.[1] Gee also provided to LADOTD for approval a sample of Inland steel, laminated by PreFinish, but intentionally mislabeled as Wheeling steel, laminated by ACI. Gee testified that Wall was unaware of this switch. As a result of this testimony, the district court dismissed, over the government's objections, the counts of the indictment alleging Wall's involvement in the conspiracy to have the Wheeling steel sample approved under false pretenses.

Wall presented testimony from his former secretary and former vice-president of sales. Neither witness provided testimony as to Wall's involvement or non-involvement in the scheme. Wall then took the stand on his own behalf. Wall denied any involvement in a conspiracy to defraud the state of Louisiana. He also denied that a conspiratorial meeting took place in Chicago as testified to by McDowell.

During closing argument, the government urged that the evidence at trial demonstrated that Wall knew of and participated in the scheme to defraud Louisiana. The government

---

[1] Although Gee testified that Inland purchased steel from National Galvanizing to meet Caldwell's needs, this testimony is inconsistent with all other witnesses who indicated that Inland purchased steel from Wheeling. However, Inland then sent the Wheeling steel to National Galvanizing to be galvanized.

mentioned the alleged conspiratorial meeting in Chicago: "Wherever that meeting occurred, Roger McDowell remembers, he and Wall discussed [removing the name from the stencil]." Defense counsel attacked McDowell's testimony during closing argument and pointed to the lack of an entry in McDowell's daily planner as proof that the meeting did not occur.

On rebuttal, the government responded and stated that Wall made a "big deal" about the Chicago meeting and that Wall testified "very loudly, very emphatically it didn't happen." The government emphasized that the only evidence supporting Wall's claim that the meeting did not occur was "the unsupported testimony of Rick Wall." The government further argued that:

> we are not the only people who can call witnesses. The defendant has the subpoena power. You saw two out-of-state witnesses testify there before you. If this was a big deal, and if that meeting didn't really take place, either of those two other gentlemen [Ristau and Hartwig] could have been called by a witness by either side.

Wall did not object to the government's arguments.

The judge instructed the jury, among other things, that the arguments of counsel were not evidence and that the jury should only weigh the evidence presented at trial. After deliberation, the jury found Wall guilty of conspiracy and the remaining mail fraud counts. Wall was acquitted on the false statement counts.

### *Motion for New Trial*

Within seven days of the jury verdict, Wall filed a motion for acquittal pursuant to Fed. R. Crim. P. 29, and a motion for new trial pursuant to Fed. R. Crim. P. 33. In his motion for new trial, Wall argued that (1) a juror had been dismissed for improper reasons; (2) the government failed to disclose McDowell's testimony regarding the November 1993 Chicago meeting involving McDowell, Wall, Ristau, and Hartwig; and (3) Wall obtained newly discovered evidence in the

7

form of a statement from Ristau, who denied that he took part in a conspiratorial meeting as testified to by McDowell. In his motion, Wall argued that Ristau's statement was not available prior to trial because the prosecution had advised Ristau that it was not in his best interest to talk to other witnesses regarding the case. In a later pleading, Wall contended that newly discovered evidence from Ristau and Hartwig would demonstrate that the Chicago meeting did not take place. Although he did not attach an affidavit to his motion, Wall eventually obtained an affidavit from Ristau. In that affidavit, Ristau stated:

> There was never a meeting or conversation in which I participated in which I, knowing that the State of Louisiana's specifications required the name of the laminator to appear in the stenciling of the product, agreed to have the product produced in violations [sic] of those specifications and to not disclose that to the state.

Ristau further stated that "[t]o the extent McDowell represents this to have occurred his testimony is in error and is not an accurate statement of the facts of any meeting that I attended or participated [in]." Defense counsel also provided an affidavit indicating that he had conversations with Hartwig in which Hartwig also denied that a conspiratorial meeting took place, but that Hartwig was not willing to provide a statement.

### *District Court's Order*

The district court conducted a hearing on the motions. The court found that there was sufficient evidence to support the conviction and denied the motion for acquittal. The court also rejected Wall's contention that a new trial was warranted based on the dismissal of a juror or based on a *Brady*[2] violation.

The court then proceeded to analyze whether a motion for new trial should be granted

---

[2] *Brady v. Maryland*, 373 U.S. 83 (1963).

8

based on newly discovered evidence under the *Berry* rule. *See United States v. Erwin*, 277 F.3d 727, 731-32 (5ᵗʰ Cir. 2001); *Berry v. State*, 10 Ga. 511 (1851). The district court first analyzed the statements of Ristau and Hartwig and determined that the affidavits constituted newly discovered evidence that was not available at the time of trial through no fault of Wall's and that the evidence was not merely cumulative or impeaching. The court reasoned that "because the government capitalized on the absence of such evidence during its closing argument to impeach the credibility of the defendant, such evidence is material."

After dealing with all of the other *Berry* factors, the court turned to the final *Berry* factor, whether the newly discovered evidence probably would have resulted in an acquittal. The court found that "*it is likely* that the jury could have found the defendant guilty based on the testimony of Mr. Lovelace and Mr. Clement." (emphasis added). However, the court abruptly interrupted its *Berry* analysis and determined that because the motion for new trial was made promptly within seven days of the judgment, it did not need to reach the issue of whether the testimony of Ristau and Hartwig probably would have resulted in an acquittal. It held that the *Berry* rule does not apply to motions filed within seven days of the verdict and based on the "interests of justice." Instead, the district court explained that "'the more onerous restrictions on later motions on the ground of newly discovered evidence do not apply.'" *Quoting* WRIGHT, FEDERAL PRACTICE & PROCEDURE: CRIMINAL § 557 (2d ed. 1982).[3]

The district court then proceeded to analyze whether Wall's motion should be granted in the "interests of justice." It granted Wall's motion based on the newly discovered evidence in conjunction with the government's comments during rebuttal. In reaching this conclusion the

---

[3] The district court cited to § 755. In fact, the quoted portion is found at § 557.

district court stated that:

> This alleged conspiratorial meeting was a small piece of evidence in a lengthy and complex trial. However, if Mr. Ristau and Mr. Hartwig *had* testified for the defense, the government would not have been able to argue to the jury, moments before deliberation, that the defendant's entire case hung on the defendant's own uncorroborated testimony.

> Ultimately, this court is left with the unusual circumstance that, although defendant's newly discovered evidence was not, itself, material, the government made it material by capitalizing on it during closing argument. While the government no doubt acted in good faith, its suggestion to the jury that the defendant must be guilty because Mr. Ristau and Mr. Hartwig did not testify disrupted the "equal playing field between the prosecution and the defense necessary to allow the jury to perform its truth-seeking function."

The government filed a timely notice of appeal from the district court's grant of new trial.

## II. LAW AND ANALYSIS

### A. Jurisdiction

This court has jurisdiction of the case by operation of 18 U.S.C. § 3731, which provides that the government may appeal the grant of a new trial after verdict or judgment, except that no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution. *See United States v. Frye*, 372 F.3d 729, 733-34 (5th Cir. 2004); *United States v. Woolard*, 981 F.2d 756, 757 (5th Cir. 1993). The double jeopardy clause is not implicated in this case.

### B. Standard of Review

A district court's decision to grant or deny a motion for new trial pursuant to Rule 33 is reviewed for an abuse of discretion. *United States v. O'Keefe*, 128 F.3d 885, 893 (5th Cir. 1997). This standard is necessarily deferential to the trial court because the appellate court has only read the record and, unlike the trial court, did not see the impact of witnesses on the jury or observe

10

the demeanor of witnesses. *Id.* Questions of law are reviewed *de novo*. *Id.* On mixed questions

of law and fact, this court reviews the underlying facts for abuse of discretion, but the conclusions

to be drawn from those facts *de novo*. *Id.* at 893-94. This court will uphold the trial court's

decision to grant a new trial if that decision is in the interest of justice. *Id.* at 898. The "interest

of justice" may be based on the trial judge's evaluation of witnesses and weighing of the evidence.

*Id.*

## C. Rule 33

Rule 33 states in relevant part:

> (a)     Defendant's Motion. Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires. . .
>
> (b)     Time to File.
> (1) Newly Discovered Evidence. Any motion for new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty. . .
>
> (2) Other grounds. Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 7 days after the verdict or finding of guilty, or within such further time as the court sets during the 7-day period.

Rule 33 permits the district court to vacate judgment and grant a new trial "if the interest of

justice so requires." Fed. R. Crim. P. 33; *see United States v. McBride*, 862 F.2d 1316, 1319 (8[th]

Cir. 1988) (the interest of justice standard "requires the district court to balance the alleged errors

against the record as a whole and evaluate the fairness of the trial."). However, Rule 33 divides

motions for new trial based on the interest of justice into two different subcategories: (1) motions

based on newly discovered evidence; and (2) motions based on "other grounds." The former may

be brought within three years of the verdict or finding of guilt, while the latter must be brought within seven days of the verdict or finding of guilt.

Generally, this court has held that the trial court should not grant a motion for new trial unless there would be a miscarriage of justice or the weight of evidence preponderates against the verdict. *O'Keefe*, 128 F.3d at 898. A new trial is granted only upon demonstration of adverse effects on substantial rights of a defendant. *United States v. Rasco*, 123 F.3d 222, 228 (5th Cir. 1997).

When a court of appeals reviews a district court's decision to grant or deny a motion for new trial, to some extent it must begin with the error or grounds upon which the district court based its decision and then proceed to examine the court's decision as measured against the relevant standard.[4] *See e.g. United States v. Runyan*, 290 F.3d 223, 247 (5th Cir. 2002) (applying three-prong *Brady* test to motion for new trial based on alleged *Brady* violation); *United States v. Logan*, 861 F.2d 859, 864 (5th Cir. 1988) (holding that the *Strickland* analysis for ineffective assistance of counsel applies to motions for new trial); *cf. McBride*, 862 F.2d at 1319 (holding that the district court should balance the alleged errors against the record as a whole). Otherwise, it would be impossible to give any meaning to the concept of "miscarriage of justice."[5] Thus, we turn to the possible grounds for the district court's granting Wall's motion for new trial.

There is some uncertainty as to the precise basis for the district court's decision to grant

---

[4] In collateral review cases, the term "miscarriage of justice" means the conviction of one who is actually innocent. *See United States v. Olano*, 507 U.S. 725, 736 (1993). As with plain error review under Rule 52(b); however, the term "miscarriage of justice" permits remedial action under Rule 33 in cases other than just "actual innocence." *See id.*

[5] Defendant unconvincingly asserts "[a]ll that is needed is the Judge's feeling that a miscarriage of justice has taken place."

12

Wall's Rule 33 motion. The district court explicitly declined to consider fully the motion under the applicable standard for newly discovered evidence; yet newly discovered evidence, in the form of post-trial affidavits, is precisely what convinced the district court to grant the motion for new trial. The district court then indicated that it would grant the motion based on the "interests of justice."[6] The three potential grounds that seem to be implicated by the court's ruling are (1) newly discovered evidence; (2) false testimony revealed by newly discovered evidence; and (3) the prosecutor's comments during closing argument.

## 1. Newly Discovered Evidence

Motions for new trial based on newly discovered evidence are "disfavored and reviewed with great caution." *Erwin*, 277 F.3d at 731. As a general rule, there are five prerequisites (typically referred to as the *Berry* rule) that must be met to justify a new trial on the ground of newly discovered evidence.[7] The defendant must prove that (1) the evidence is newly discovered and was unknown to the defendant at the time of trial; (2) the failure to detect the evidence was not due to a lack of diligence by the defendant; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) the evidence if introduced at a new trial would probably produce an acquittal. *Id.* at 231-32. If the defendant fails to demonstrate any one of

---

[6] The district court relied on WRIGHT, FEDERAL PRACTICE & PROCEDURE § 557 (2d ed. 1982), in support of its conclusion that promptly filed motions based on newly discovered evidence are not reviewed using the *Berry* rule. The third edition of Wright, which is the most current version, no longer contains the legal proposition quoted from Wright and so prominently relied upon by the district court. *See* WRIGHT, FEDERAL PRACTICE & PROCEDURE § 557 (3d ed. 2004).

[7] The Fifth Circuit has described the *Berry* rule as having four or five parts. *See Erwin*, 277 F.3d at 731-32 (five-part test); *United States v. Sullivan*, 112 F.3d 180, 183 (5th Cir. 1997) (four-part test). Some statements of the standard combine the element of materiality with whether the evidence is merely impeaching or cumulative.

13

these factors, the motion for new trial should be denied. *United States v. Freeman*, 77 F.3d 812, 817 (5th Cir. 1996). The government suggests that the district court improperly applied the *Berry* rule for newly discovered evidence in its treatment of the testimony of Ristau and Hartwig. The government does not focus its argument exclusively on the *Berry* rule; nor does it explicitly assert that the district court applied the wrong standard of review when it declined to address the fifth and final factor of the *Berry* analysis. Nevertheless, we conclude that the government has properly raised the trial court's failure to follow *Berry*.[8]

The district court erred in its application of the requisite standard of review. It concluded that the motion for new trial, although based in part on newly discovered evidence, was not subject to the *Berry* factors because it was filed within seven days of the jury verdict. Instead, the district court concluded that the motion should be granted in the "interest of justice." Contrary to the district court's conclusion, the "interest of justice" is not an independent ground for granting a Rule 33 motion, but rather is the standard for granting *any* Rule 33 motion, whether based on newly discovered evidence or other grounds. *See United States v. Villareal*, 324 F.3d 319, 325 (5th Cir. 2003) ("motion for new trial based on newly discovered evidence may be filed any time within three years after the verdict or finding of guilt, and may be granted by the district court 'if the interests of justice so require.'"). Whether a motion for a new trial based on newly discovered

---

[8] The government argued in reference to the *Berry* factors that "the trial judge's implicit finding that the evidence was unavailable to Wall even though Wall exercised due diligence is incorrect." Later, the government asserted "by the district court's own analysis, there was no newly discovered evidence that would warrant a new trial under Berry." In its reply brief, the government reasserted that "there was no newly discovered evidence under Berry;" and that "Wall took the stand and denied the meeting took place; had Ristau and Hartwig testified, their testimony would have served only to corroborate Wall's testimony and to impeach McDowell's. This is exactly the sort of evidence that is not 'newly discovered' for purposes of the Berry rule."

14

evidence is filed within seven days, or some time later, but still within three years, the standard of review is the same. *See United States v. Quintanilla*, 193 F.3d 1139, 1146-47 (10th Cir. 1999) (rejecting the notion that a motion based on newly discovered evidence, if filed within seven days, is analyzed under a different test); *United States v. Johnson*, 26 F.3d 669, 682 n.9 (7th Cir. 1994) (same). The obvious reason for the differentiation in the filing deadlines is that a defendant may not learn of newly discovered evidence until well after the trial, but should know all other grounds at the time of trial.

As the Tenth Circuit has explained, "[a] number of circuits have stated, without any substantive explanation and often in dicta, that a motion for new trial which is based on newly discovered evidence and is asserted within seven days after the verdict, is subject to a heightened discretion standard." *Quintanilla*, 193 F.3d at 1146. The Tenth Circuit rejected that distinction. *Id.* at 1147. The court further explained that if motions based on newly discovered evidence were treated differently if asserted within seven days of the verdict, "defendants would have no diligence obligation and could keep an evidentiary trump card in the event of a conviction. Such a rule also would penalize convicted defendants who discover exculpatory evidence more than seven days (but within three years) of the verdict." *Id.* We agree with this assessment of Rule 33 and hold that whether a motion for new trial based on newly discovered evidence is filed within seven days or within three years of the verdict, the *Berry* rule applies.[9]

_____

[9] Both *Quintanilla* and WRIGHT § 557 (2d ed. 1982) cite to a Fifth Circuit case, *United States v. Rachal* 473 F.2d 1338 (5th Cir. 1973), in support of the contention that a promptly filed Rule 33 motion based on newly discovered evidence is somehow treated differently from a Rule 33 motion based on newly discovered evidence filed later than seven days after the verdict or judgment. In *Rachal*, the defendant filed his motion for new trial twenty-seven days after the verdict. *Id.* at 1343. Hence, the court applied the *Berry* rule and recognized in dicta that a defendant bears a heavier burden to carry a motion for new trial based on newly discovered

15

The district court's decision to grant a new trial hinged on the existence of newly discovered evidence. Although the prosecutor's comments in closing argument played a crucial role in its analysis, the district court never would have reached the decision to grant a new trial but for the "newly discovered" post-trial statements of Ristau and Hartwig. The district court apparently recognized that newly discovered evidence was the basis of Wall's motion. However, the district court declined to apply the last factor of the *Berry* test, not because the motion did not implicate newly discovered evidence, but because the motion for new trial was filed promptly within seven days of the verdict. Thus, the district court erred as to a question of law, which we review *de novo*. Consequently on review, we must examine Wall's newly discovered evidence under the appropriate *Berry* test.

### a. The Berry Test

### (1) First Berry Factor: evidence unknown at time of trial

Under the first of the *Berry* factors, the district court concluded that the evidence was unknown to the defendant at the time of trial. It is true that Wall did not have Ristau's affidavit in his possession prior to or during trial. Arguably, Wall has satisfied the first *Berry* factor.

### (2) Second Berry Factor: due diligence

Evidence that is unknown at the time of trial cannot be the basis for granting a new trial if the defendant should have known of its existence through the exercise of due diligence. Wall did not know that McDowell was going to testify regarding a meeting in Chicago; however,

---

evidence as opposed to motions filed within seven days of the verdict. It is questionable whether *Rachal* stands for the proposition that the standard of review for motions based on newly discovered evidence changes merely depending on whether or not it was filed within seven days of the verdict. Regardless, *Rachal* makes this alleged distinction in dicta.

16

McDowell's testimony occurred on the third day of a two-week trial.[10]  Thus, Wall became aware of the potential significance of testimony from Ristau and/or Hartwig early in the trial.  Nevertheless, their affidavits were not produced until after the trial.

When a defendant becomes aware of evidence early in a trial, it is incumbent upon the defendant to seek a continuance or demonstrate efforts to obtain the evidence before it will be considered newly discovered.  *See United States v. Mulderig*, 120 F.3d 534, 546 (5th Cir. 1997) (failure to investigate or seek a continuance on government's theory constitutes lack of due diligence); *Sullivan*, 112 F.3d at 183 (defense counsel was made well aware of government's theory of intent early in trial, yet did not investigate this theory); *United States v. Peña*, 949 F.2d 751, 758 (5th Cir. 1991) (defendant was aware of alleged new evidence regarding a witness' drug and alcohol problems "[a]t trial, if not before"); *United States v. Wilson*, 894 F.2d 1245, 1251 (11th Cir. 1990) (defendants were on notice of witnesses cooperation with government "midway through the trial").

During the trial, Wall did not have physically within his possession statements from Ristau and Hartwig denying that the Chicago meeting took place.  However, as soon as McDowell testified that he participated in a meeting with Wall, Ristau, and Hartwig, Wall possessed all the information necessary to begin looking for the "newly discovered evidence."  *See Villareal*, 324 F.3d at 326 (defense counsel's failure to appreciate the significance of impeachment testimony constituted a lack of diligence).  McDowell testified that Wall was present at a conspiratorial meeting in Chicago.  Wall denied that such a meeting took place.  Assuming that Wall's testimony

---

[10] McDowell testified on February 27, 2002.  The court did not submit the case to the jury for deliberation until March 8, 2002.

17

was true, Wall knew during the trial that McDowell's statement was false and that Ristau and Hartwig could corroborate his contention that no such meeting took place. It was incumbent upon Wall to take measures to secure the testimony of Ristau and/or Hartwig. *See Sullivan*, 112 F.3d at 183 (upholding district court's finding that defendant lacked due diligence where adverse witness testified at the beginning of trial). In fact, the district court noted that Wall gave no reason why these witnesses were not subpoenaed after McDowell's testimony. This court and others have found no abuse of discretion where district courts found that due diligence was lacking because defendant gained knowledge of the "new evidence" during trial but failed to seek a continuance or subpoena witnesses. *See Mulderig*, 120 F.3d at 546 (defendant failed to seek continuance to explore the matter of "new evidence"); *Sullivan*, 112 F.3d at 183 (defendants failed to seek continuance); *United States v. DeLuca*, 137 F.3d 24, 40 (1st Cir. 1998) (defendant failed to seek continuance or invoke compulsory process); *see also McBride*, 862 F.2d at 1319 (holding that in reviewing a motion for new trial, "[c]ounsel cannot stand idly by, permit the presentation of erroneous matter at trial, and then complain about the inclusion of that evidence in the trial record, absent plain error."). By the same token, in light of the fact that the district court specifically found no reason proffered as to why Wall did not locate Ristau and Hartwig during the course of trial, the district court erred in concluding that Wall satisfied the due diligence factor under *Berry*.

### (3) Third Berry Factor: evidence not cumulative or impeaching

The district court found that Ristau's and Hartwig's testimony would not be cumulative or impeaching. This is contrary to Wall's own admission on appeal that the premise of his motion

18

for new trial was to secure the "impeaching" testimony of Ristau and Hartwig.[11]  Impeachment testimony normally is not a basis for granting a motion for new trial.  *See Mesarosh v. United States*, 352 U.S. 1, 9 (1956); *Villareal*, 324 F.3d at 326 (concluding that testimony "could have served no purpose other than to impeach the testimony" of a government witness); *United States v. Reedy*, 304 F.3d 358, 372 (5th Cir. 2002) (upholding district court's denial of motion for new trial based on newly discovered impeachment evidence); *Peña*, 949 F.2d at 758 ("[e]vidence which merely discredits or impeaches a witness' testimony does not justify a new trial.").  The affidavits regarding Ristau and Hartwig relate exclusively to McDowell's testimony that a conspiratorial meeting took place in Chicago.  The affidavits do not purport to exonerate Wall in any other fashion or weigh on any other issues that were before the jury.  The district court's conclusion that this was not impeachment evidence was erroneous.

### *(4) Fourth Berry Factor: materiality*

The district court candidly found that Ristau and Hartwig's testimony was not material in and of itself.  Rather, it was only by virtue of the prosecution's rebuttal argument that the testimony became material.  The new evidence does bear on whether Wall participated in a conspiratorial meeting in Chicago, which if it had been presented during the trial could have been considered by the jury.

The district court relied on the alleged testimony of both Ristau and Hartwig when it analyzed the *Berry* test.  Although Ristau provided an affidavit, Hartwig refused to provide a statement.  In evaluating Hartwig's proposed testimony, the district court had before it only

---

[11] In concluding his brief on appeal, Wall argues that "[t]he premise of Wall's argument all along has been that McDowell proffered false testimony, and had William Ristau and Richard Hartwig been called to testify, they would have *impeached* McDowell." (emphasis added).

19

representations from defense counsel repeating statements that Hartwig had made to counsel. Other circuits have held that a motion for new trial may not be based on inadmissible evidence. *See United States v. Parker*, 903 F.2d 91, 102-03 (2[d] Cir. 1990); *United States v. MacDonald*, 779 F.2d 962, 964 (4th Cir. 1985). Thus far, Wall has submitted only inadmissible hearsay from Hartwig. We conclude that the district court's reliance on Hartwig's hearsay testimony was erroneous.

Ristau's affidavit is of marginal value to Wall's defense. Ristau's affidavit actually makes no reference to whether Wall did or did not participate in a meeting in Chicago, only that Ristau himself did not participate in a meeting in which he "knowing that the State of Louisiana's specifications required the name of the laminator to appear in the stenciling on the product, agreed to have the product produced in violations [sic] of those specifications and did not disclose that to the State." Ristau's statement is very carefully and narrowly worded. Ristau does not say that a meeting was not held by these same participants in Chicago, or elsewhere, in which this very topic was discussed. He does not even deny that a meeting or discussion took place in which these same participants agreed to change the stencils at Caldwell's request. He merely denies that such a meeting took place at a time when Ristau knew that Louisiana required the name of the laminator to appear on the stenciled product and that he agreed to the change without notifying the State of Louisiana. The affidavit denies Ristau's culpability, but touches only indirectly on Wall's participation in the conspiracy. The district court erred in concluding that Ristau's statement was material.

### (5) Fifth Berry Factor: weight of new evidence

There remains the question posed by the district court but left unanswered in its *Berry*

20

analysis: would the testimony of Ristau *probably* have resulted in an acquittal? There is considerable evidence of Wall's guilt outside of McDowell's testimony. Reflecting this fact, the district court concluded that the evidence was sufficient to support a finding of guilt and that it was likely the jury could have found Wall guilty based on the testimony of Clement and Lovelace. The implication is that the trial court did not feel Wall had met this fifth *Berry* factor, but the trial court felt it was not fair to so find in view of the government's comments during closing argument.

A brief review of the evidence convinces this court that there was ample evidence of Wall's guilt when measured against the conflicting testimony of Wall and Ristau. For example, Clement expressly testified that he communicated with Wall regarding Louisiana's specifications for polymer coated steel and that Wall reassured Clement that the product delivered to Louisiana highway projects was manufactured in accordance with the state's specifications. The parties stipulated at trial that the product that came from Caldwell, and which was used in Louisiana highway projects, in fact was not manufactured using the approved Blac-Klad product. Wall was regional sales manager. The jury easily could have inferred that this was in Wall's area of responsibility and that he would have had knowledge of what was taking place.

Although Wall challenges whether the Chicago meeting took place as testified by McDowell, McDowell's contention that he discussed with Wall a scheme to deviate from Louisiana's specifications was corroborated by a contemporaneous memo written by McDowell on November 8, 1993. This memo was addressed to Wall and spelled out that Caldwell would accept a deviation from Louisiana's specifications, not that Louisiana had waived the specifications. The memo further spelled out that the work was to be done by ACI, which was

21

not approved under the LADOTD's qualified product listing, rather than by PreFinish Metals, which had been approved to do the laminating. The memo further noted that the stencils would not reference the new coil laminator. When questioned at trial, Wall did not deny having received the memo. Lovelace testified unequivocally that he and Wall arranged to manufacture culverts for Louisiana highway projects using an unapproved product. Other witnesses offered corroborating testimony. Specifically James Smith and Bryan Stephens, who were employees of Inland, and Don Gee, the vice-president of Caldwell, all gave testimony that strongly implicated Wall's guilt. Based on this overwhelming evidence of guilt, the court concludes that Wall failed to meet his burden on the final *Berry* factor. Wall failed to establish that Ristau's testimony probably would have resulted in an acquittal.

As demonstrated above, the district court's decision to grant a new trial based on the newly discovered evidence of Ristau and Hartwig does not withstand scrutiny under the appropriate *Berry* analysis. Wall clearly did not meet his burden as to four of the five *Berry* factors. Failure to meet his burden as to any factor doomed his request for a new trial based on newly discovered evidence. *See Freeman*, 77 F.3d at 817.

### b. False Testimony

Wall introduces an additional wrinkle into the analysis of newly discovered evidence. He asserts that the newly discovered evidence which he relies on for a new trial establishes that McDowell's testimony was false. Thus, Wall argues that even if the district court's judgment were based on newly discovered evidence, the appropriate test would be the *Larrison*[12] rule

---

[12] *See Larrison v. United States*, 24 F.2d 82, 87-88 (7th Cir. 1928), overruled by *United States v. Mitrione*, 357 F.3d 712, 717-18 (7th Cir. 2004).

rather than the *Berry* rule. At the conclusion of his brief on appeal, Wall contends that "[t]he premise of Wall's argument all along has been that McDowell proffered false testimony, and had William Ristau and Richard Hartwig been called to testify, they would have impeached McDowell."

As an initial matter, we reject Wall's assertion that the *Larrison* rule should apply. The *Larrison* rule provides a relaxed standard for granting a new trial when material testimony that is false or perjured is presented at trial. *See Larrison*, 24 F.2d at 87-88. Under this relaxed standard, the court may grant a new trial if it is reasonably well satisfied that a material witness gave false testimony, that without the false testimony the jury might have reached a different result, and that the party seeking the new trial was taken by surprise by the false testimony and was unable to meet it or did not know of its falsity until after trial. *Id.* However, this circuit has not adopted the *Larrison* rule for evaluating false testimony. *See Sullivan*, 112 F.3d at 183 n.3. Moreover, the Seventh Circuit recently overruled *Larrison*. *See Mitrione*, 357 F.3d at 717-18.

Although the district court did not explicitly rule that it would grant Wall's motion based on false testimony, the court's opinion cited to portions of this court's *O'Keefe* opinion that relate to the government's knowing use of false testimony. The knowing use of false testimony is commonly referred to as a *Napue* violation after the Supreme Court's opinion in *Napue v. Illinois*, 360 U.S. 264 (1959). The district court's language mimics portions of *O'Keefe's* explanation for the appropriate standard of review for a *Napue* violation. For example, the *O'Keefe* opinion held that false testimony deprives a defendant of due process when "the government reinforces the falsehood by capitalizing on it in its closing argument." 128 F.3d at 895. Compare this with the district court's assertion that a new trial was justified because "the government made [the newly

23

discovered evidence] material by capitalizing on it during closing argument." The *O'Keefe* opinion also states that when a court assesses the materiality of false testimony, "materiality is a method of maintaining the equal playing field between the prosecution and the defense necessary to allow the jury to perform its truth-seeking function." *Id.* The district court quoted this language directly from *O'Keefe* as a basis for granting Wall's motion for new trial. In view of Wall's argument that McDowell gave false testimony, and given the district court's seeming reliance on a "false testimony" standard, it is appropriate to examine whether the underlying decision could be upheld on that basis.

This court has recognized that if the government used false testimony that it knew or should have known was false, then the standard applied for newly discovered evidence is slightly more lenient. *See United States v. MMR Corp.*, 954 F.2d 1040, 1046-47 (5th Cir. 1992). However, this standard requires a finding that the testimony in question was "actually false." *See United States v. Chagra*, 735 F.2d 870, 874 (5th Cir. 1984); *United States v. Antone*, 603 F.2d 566, 571 (5th Cir. 1979). This standard also incorporates all of the elements of a motion for new trial based on newly discovered evidence, except the fifth *Berry* factor, the testimony probably would have resulted in an acquittal. *See MMR Corp.*, 954 F.2d at 1046-47. A new trial based on false testimony is justified if there is *any reasonable likelihood* that the false testimony affected the judgment of the jury. *See id.* at 1047. Hence, a Rule 33 motion for false testimony is not as demanding a standard with respect to the impact the new evidence might have on the outcome of the trial. But, the remaining *Berry* factors for granting a new trial based on newly discovered evidence must be met even when the assertion is based on false testimony, i.e., that: (1) the evidence was unknown to defendant at the time of trial; (2) defendant's failure to learn of the

24

evidence was not due to a lack of diligence; and (3) the evidence is material, not merely cumulative or impeaching. *Id.*

The district court's order granting Wall a new trial cannot be sustained on the basis of false testimony. As explained earlier, Wall's proffered evidence fails to qualify as "newly discovered" because Wall has not demonstrated due diligence or that the evidence is anything other than impeachment evidence. Moreover he fails to meet the additional criteria for false testimony. The district court made no finding that McDowell's testimony was false or that the prosecution knowingly used perjured testimony. In fact, the court exonerated the prosecution from any wrongdoing with respect to McDowell's testimony. According to the district court's findings, the government did not know that McDowell would give testimony about the Chicago meeting. Furthermore, Wall has not established that McDowell's testimony was actually false. He has merely shown that Ristau's testimony would establish a conflict in the testimony, a far cry from showing that it was "actually false." Absent a showing that the evidence was actually false and that the government knowingly presented the false testimony, a mere conflict in evidence is insufficient to uphold the grant of a Rule 33 motion based on false testimony.

## *2. Other Grounds– Prosecutor's Closing Argument*

Given the district court's apparent decision to forego the *Berry* analysis and grant the motion for new trial in the "interest of justice," we must examine the second broad sub-category of Rule 33: whether the district court abused its discretion in granting the motion for new trial on "other grounds." If the motion is based on any "other grounds," the trial court is not required to consider the restrictive *Berry* rules. Rather, "any error of sufficient magnitude to require reversal on appeal is an adequate ground for granting a new trial." WRIGHT, FEDERAL PRACTICE &

25

PROCEDURE § 556 (3d ed. 2004).[13]  As with motions based on newly discovered evidence, "the grant or denial of the motion is entrusted to the sound discretion of the judge, motions for new trial are not favored, and are granted only with great caution."  *O'Keefe*, 128 F.3d at 898 (reviewing motion for new trial based on alleged *Brady* violation); *but see* WRIGHT, § 551 (stating that a motion for new trial based not on newly discovered evidence, but on errors or other grounds "should be neither favored nor disfavored, and the question is only what the interest of justice requires.").

The only "other ground" that Wall asserts entitles him to a new trial is the prosecutor's comment on his failure to call Ristau and Hartwig to testify.  Commenting on a failure to call witnesses generally is not an error, unless the comment implicates the defendant's right not to testify.  *See United States v. Sblendorio*, 830 F.2d 1382, 1391 (7th Cir. 1987).  Here, Wall testified on his own behalf; therefore, there was no danger that the prosecutor's comments would implicate Wall's privilege against self-incrimination.  In reviewing the denial of a motion for new trial, this court has examined alleged improper remarks by the prosecution to determine whether the remarks prejudicially affected the substantial rights of the defendant.  *See Rasco*, 123 F.3d at 228-29; *United States v. Cardenas*, 778 F.2d 1127, 1130-31 (5th Cir. 1985).  In determining whether the prosecutor's remarks affected a defendant's substantial rights, the trial court should

---

[13] WRIGHT, § 556 provides an illustrative list of the types of errors that might justify a motion for new trial on "other grounds": denial of a separate trial, absence of witnesses, objections to jurors or the jury selection process, failure to provide discovery, the lack of an intelligent waiver of trial by jury, incompetency to stand trial, absence of defendant from the trial, refusal to allow defendant to be free on bail during the trial, exclusion of evidence, admission of improper evidence, accepting a plea of guilty from a codefendant during trial, variance between the indictment or information and the proof, instructions to the jury, and allowing the jury to separate during deliberations.

consider (1) the magnitude of the prejudicial effect of the statements; (2) the efficacy of any cautionary instructions; and (3) the strength of the evidence of defendant's guilt. *Cardenas*, 778 F.2d at 1131. The district court specifically found that the prosecution did not act in bad faith. Wall did not object to the prosecution's comment. Furthermore, there was ample evidence of Wall's guilt, and the jury was instructed that the closing arguments of counsel were not evidence.

The magnitude of the prejudicial effect of the prosecutor's remarks is the only factor that arguably weighs in Wall's favor. The district court specifically pointed out that the prosecutor commented on the failure to call witnesses "moments before deliberation." Nevertheless, given the lack of bad faith on the part of the government, and given the considerable evidence of Wall's guilt, Wall failed to demonstrate that the prosecutor's remarks amounted to a miscarriage of justice. Even considering the prosecutor's comments in conjunction with Ristau's affidavit, Wall fails to satisfy the miscarriage of justice standard.

### III. CONCLUSION

Wall has not provided an adequate basis for upholding the district court's grant of a motion for new trial. Whether his motion is based on newly discovered evidence, false testimony, or prosecutorial misconduct none of these grounds, singularly or collectively, provided an adequate vehicle under the facts of this case for the district court to disturb the jury's verdict. This is particularly true in light of the considerable evidence of guilt, which even the district court recognized in its opinion. Given the fact that new trials granted pursuant to Rule 33 are generally disfavored regardless of whether based on newly discovered evidence or other grounds, *see O'Keefe*, 128 F.3d at 898, the district court abused its discretion when it vacated the jury verdict and granted a new trial.

27

Accordingly the district court's order is VACATED and the case REMANDED. The district court is instructed to re-instate the jury verdict.

VACATED AND REMANDED, with instructions.