# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 22, 2010

No. 09-10064

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

MARK MANNERS; ANDREW SIEBERT,

Defendants - Appellants.

Appeal from the United States District Court
for the Northern District of Texas, Dallas Division
USDC No. 3:05-CR-220-2

Before DeMOSS, ELROD, and HAYNES, Circuit Judges.

PER CURIAM:[*]

Appellants Mark Manners and Andrew Siebert appeal from the district court's denial of their joint motion for new trial after a jury convicted them of conspiracy to commit bank fraud, wire fraud, and mail fraud, as well as bank fraud, wire fraud, and mail fraud. Appellants assert that a new trial is warranted due to the government's violation of its obligations under *Napue v. Illinois*, 360 U.S. 264 (1959) and *Brady v. Maryland*, 373 U.S. 83 (1963). For the following reasons, we AFFIRM.

---

[*] Pursuant to 5th Cir. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

No. 09-10064

## I.

## A.

A grand jury charged Appellants, along with codefendant Charles Burgess, with participating in a mortgage fraud scheme. The basic function of this scheme was to fraudulently obtain loans from mortgage lenders through the use of straw borrowers. As part of the scheme, Burgess would recruit individuals who had high credit scores, but few assets, to apply for bank financing in their own names and sign the closing paperwork. Siebert, as a licensed escrow officer, participated in the scheme by circumventing the safeguards put in place by the escrow provisions of the purchase agreements. Siebert prepared closing statements indicating that the funds for the down payment would come from the straw borrowers. According to the financial records introduced at trial, however, these down payments actually originated from loan proceeds that Siebert was supposed to hold in escrow until closing. In essence, Siebert facilitated the scheme by releasing escrow funds before the lenders had given their approval; a portion of these funds was then used as the straw buyers' "down payments." Manners' role in the scheme was to falsify the straw buyers' financial statements in order to portray them as having substantially greater assets than they actually possessed.

Burgess, as a cooperating codefendant, provided important testimony implicating Appellants. Burgess testified that Manners provided the false documents needed to close the transactions and that the scheme could not have succeeded without the cooperation of Siebert. Burgess also testified that he informed both Siebert and Manners about the fraudulent nature of the real estate transactions. Appellants' defense rested in part on impeaching Burgess's credibility during trial. They also sought to demonstrate that Burgess's *modus operandi* was to secure the unwitting cooperation of escrow officers and other innocent third parties in his fraud schemes.

No. 09-10064

The heart of this appeal concerns Burgess's testimony regarding his involvement in another real estate scam associated with a series of real estate transactions that involved Oxford Estate Properties (hereinafter the "Oxford fraud scheme"). The weekend after trial had begun, defense counsel for Appellants received information from the prosecution indicating that Burgess was an active participant in the Oxford fraud scheme. Counsel submitted a joint motion for discovery of any and all information provided by Burgess regarding criminal activity by other persons that the government had determined to be untrue. The district court conducted a hearing on this issue, during which the government indicated that the FBI was still conducting its investigation and had not yet determined that any of Burgess's statements regarding criminal activity was false. Subsequently, the prosecution informed the district court that "[t]he report is that none of the information that the government has been able to obtain indicates that Mr. Burgess has lied to the government in any way." The district court conducted an *in camera* interview with the FBI's counsel the following morning. The district court indicated that it was satisfied that the FBI had not reached any definitive conclusion that the information provided by Burgess was inaccurate.

During cross examination, Burgess denied any significant participation in the Oxford fraud scheme, insisting that he only made phone calls on behalf of Oxford without any knowledge of its fraudulent activities. On redirect, the following exchange occurred between Burgess and the prosecutor:

Q. Let me just cut right to the heart of this thing. During the period of December '05 through June of '06, did you, or did you not, aid, abet, assist, conspire with, or do anything else illegal with the Ransoms in connection with real estate transactions related to Oxford Properties? Yes or no.

A. No.

Q. Did you make phone calls to investors for them?

3

No. 09-10064

A.    Yes, I did.

Q.    When you made phone calls to investors did you know that the Ransoms had any plan to defraud these investors?

A.    No, I didn't. Not originally, I did not.

After Burgess had testified, the defense presented an affidavit and the testimony of Judy Miarka, who lost $60,000 in the Oxford fraud scheme. Miarka testified that Burgess's involvement in the Oxford fraud scheme went far beyond merely making phone calls on behalf of the company. Miarka also testified that Burgess had tricked her into purchasing a house in Florida, which he then used as his personal residence.

Miarka discovered certain suspicious documents and a computer hard drive belonging to Burgess in the Florida home. She sent these items to Agent Zito of the FBI, who was investigating Burgess. After trial, the government confronted Burgess with these items and inquired as to whether he had lied about his involvement in the Oxford fraud scheme. Burgess admitted that he had perjured himself at trial.

In addition to the controversy surrounding Burgess's testimony, questions arose as to whether the government failed to disclose exculpatory evidence to the defense in a timely manner. Appellants both filed discovery motions seeking any and all information covered by *Brady v. Maryland*, 373 U.S. 83 (1963). One week prior to trial, the Government faxed to defendants a copy of an e-mail that the U.S. Attorney's office had received from John Head, an attorney in Denver (hereinafter the "Head e-mail"). The Head e-mail suggested that Burgess may have participated in the Oxford fraud scheme. On the night before trial, the government faxed between fifteen and seventeen pages of investigation reports and interview notes. Among these materials was a report relating to an interview of Burgess on May 16, 2006. This report likewise indicated that Burgess may have participated in the Oxford fraud scheme.

4

No. 09-10064

At trial, defense counsel examined the items contained in the box of information that Miarka had provided to the FBI for the first time.  The box contained an altered mortgage contract with Burgess's signature taped over the original signer's.  Agent Segedy of the FBI, who had received the box from Agent Zito, testified that this document indicated fraudulent activity.

**B.**

Appellants filed a joint motion for a new trial on the ground that the government had knowingly used or failed to correct Burgess's false testimony in violation of *Napue v. Illinois*, 360 U.S. 264 (1959).  They argued that by the time the prosecutor questioned Burgess as to whether he had any involvement with the Oxford fraud scheme, the FBI had interviewed Miarka and obtained evidence indicating that Burgess was involved in fraudulent activity.  According to Appellants, the FBI's knowledge was imputed to the prosecutor.  They also argued that the government had failed to live up to its obligations under *Brady*, 373 U.S. at 87 by not disclosing the evidence obtained from Miarka, the Head e-mail, and the May 16, 2006 Burgess interview in a timely manner.

During the hearing on Appellants' motion, the district court expressed skepticism as to the validity of the *Brady* claims.  The district court found that while the government was tardy in providing certain materials, there was no reasonable probability that the outcome of the trial would have been different if the materials had been turned over earlier. The district court was deeply troubled by the use of false testimony in this case, especially with respect to the government's rehabilitation of Burgess on redirect examination. Ultimately, the district court felt that the interests of justice would be served by a new trial and indicated that it would grant the motion.

After the government indicated that it would file a motion for reconsideration, however, the district court informed the parties that it would not issue a final ruling on the matter until it had received supplemental briefing.

5

The district court then granted the government's motion for reconsideration and denied the motion for new trial. The district court found that the government did not have actual knowledge that Burgess's testimony was false until after the trial had ended. The district court found that the government had no duty under Fifth Circuit precedent to investigate its suspicions of Burgess during trial. The district court also agreed with the government that the Oxford fraud scheme was a collateral matter and that Burgess's testimony regarding his involvement was not material. Appellants filed a timely notice of appeal.

## II.

This court reviews the denial of the motion for new trial under an abuse of discretion standard. *United States v. O'Keefe*, 128 F.3d 885, 893 (5th Cir. 1997). "A district court abuses its discretion if it bases its decision on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Esmark Apparel*, *Inc. v. James*, 10 F.3d 1156, 1163 (1994) (citation omitted). "This standard is necessarily deferential to the trial court because we have only read the record, and have not seen the impact of witnesses on the jury or observed the demeanor of the witnesses ourselves, as has the trial judge." *O'Keefe*, 128 F.3d at 893. Questions of law, however, are reviewed *de novo*. *United States v. Howard*, 517 F.3d 731, 736 (5th Cir. 2008). We review the district court's *Brady* determinations *de novo*. *United States v. Martin*, 431 F.3d 846, 850 (5th Cir. 2005).

## A.

Motions for a new trial based on newly discovered evidence are normally subject to "an unusually stringent substantive test." *United States v. Holmes*, 406 F.3d 337, 359 (5th Cir. 2005) (internal quotation marks and citation omitted). The discovery after trial that a witness committed perjury constitutes newly discovered evidence, but the standard in these circumstances is "slightly

6

No. 09-10064

more lenient." *United States v. Wall*, 389 F.3d 457, 473 (5th Cir. 2004).[2] Under this standard, "[a] new trial based on false testimony is justified if there is *any reasonable likelihood* that the false testimony affected the judgment of the jury." *Id*. (emphasis in original). In order to prevail on their *Napue* claim, Appellants must establish that (1) the statements in question are false, (2) the government knew that they were false, and (3) the statements are material and not merely cumulative. *O'Keefe*, 128 F.3d at 893. The first prong has been met as it is undisputed that Burgess committed perjury.

### 1.

Appellants argue that the prosecutors in this case were aware that Burgess committed perjury when he testified on redirect examination. During the hearing on the motion for a new trial, the lead prosecutor admitted that he was suspicious that Burgess might have lied about his involvement in the Oxford fraud scheme and that he put him back on the stand "to give him an opportunity to come clean" about his involvement with the Oxford fraud scheme. The prosecutor also stated: "quite frankly I thought on redirect [Burgess] would say, 'well, okay, I did know something about [the Oxford fraud scheme].'"

Like the district court, we are deeply disturbed by these statements. As Judge Trott aptly noted, "[t]he ultimate mission of the system upon which we rely to protect the liberty of the accused as well as the welfare of society is to ascertain the factual truth, and to do so in a manner that comports with due process of law as defined by our Constitution." *Commonwealth of N. Mariana Islands v. Bowie*, 243 F.3d 1109, 1114 (9th Cir. 2001). We take this opportunity to reemphasize in the strongest possible terms that "a trial is not a mere

---

[2] In their motion for a new trial, Appellants requested a new trial on "other grounds" rather than newly discovered evidence. *See Wall*, 389 F.3d at 466. The district court treated the motion as one based on newly discovered evidence. As the parties appear to have adopted this position on appeal, we likewise treat the motion as one based on newly discovered evidence.

'sporting event;' it is a quest for truth in which the prosecutor, by virtue of his office, must seek truth even as he seeks victory." *Monroe v. Blackburn*, 476 U.S. 1145, 1148 (1986).

Under our deferential standard of review, however, we cannot say that the district court's factual finding constitutes an abuse of discretion. At the hearing, both prosecutors emphasized that they did not know Burgess had committed perjury until after they confronted him with the documents provided by Miarka. The lead prosecutor emphasized that these documents, which significantly elevated the government's suspicions, were not available at the time Burgess testified. In cases where we have reversed the denial of a motion for new trial based on *Napue* violations, the record generally left no room for doubt that the government was aware of the perjured testimony. In *United States v. Barham*, for example, the prosecution had been informed via letter that three of its witnesses had received promises of leniency or non-prosecution in exchange for their testimony. 595 F.2d 231, 239 (5th Cir. 1979). When these witnesses denied having received any such promises under oath, however, the prosecutor failed to correct this testimony. *Id*. at 240–41. Likewise, in *United States v. Sanfilippo*, a witness for the prosecution testified that the only promise he had received was that the judge would be made aware of his cooperation. 564 F.2d 176, 177 (5th Cir. 1977). The prosecution failed to correct this testimony, despite being aware that the terms of the witness's plea bargain included a promise of immunity in another case. *Id*. at 178. We cannot say that the district court's finding that the prosecutors did not know Burgess's testimony was false at the time it was made constitutes an abuse of discretion, even though we may have reached a different result.

**2.**

Appellants argue in the alternative that the government had actual knowledge of Burgess's perjury based on the imputed knowledge of the FBI

agents who received the evidence submitted by Miarka. It is well-settled that the government may be charged with the knowledge of its investigating agents. *See Kyles v. Whitley*, 514 U.S. 419, 437 (1995). The district court rejected this argument, reaffirming its preliminary conclusion that the FBI had not yet reached a conclusion that Burgess was involved in the Oxford fraud scheme.

We likewise must give deference to this finding. Agent Segedy's testimony indicates that the FBI was in possession of information suggesting that Burgess may have been involved in additional fraudulent activities. However, Agent Segedy also testified that he was not entirely sure as to whether these activities constituted a new fraud scheme or conduct that was already covered by Burgess's plea agreement. The record in this case does not compel a conclusion contrary to that reached by the district court. This scenario stands in contrast to *Giglio v. United States*, 405 U.S. 150 (1972). In that case, one Assistant United States Attorney had promised a witness immunity in exchange for his testimony, but failed to inform the attorney who actually prosecuted the case. *Id.* at 154. The Supreme Court remanded for a new trial, observing: "[t]he prosecutor's office is an entity and as such it is the spokesman for the Government. A promise made by one attorney must be attributed, for these purposes, to the Government." *Id.* In this case, the district court satisfied itself that the FBI had not reached any definitive conclusions regarding the Oxford fraud scheme. This conclusion was based in part on an *in camera* interview between the district court and counsel for the FBI. We must defer to the judgment of the district court.

We conclude that, because the district court's factual finding that the government was not aware that Burgess's testimony was false until after trial was not clearly erroneous, it did not abuse its discretion in denying a new trial.

No. 09-10064

As this is fatal to Appellants' *Napue* claim,[4] we need not address the question of whether Burgess's testimony was material. We note, however, that this is an extremely close case and remind the government that the purpose behind *Brady*, *Napue,* and their progeny is to encourage prosecutors to avoid "tacking too close to the wind." *Kyles*, 514 U.S. at 439.

### B.

We now turn to Appellants' *Brady* claim. Appellants argue that the government's failure to turn over the Miarka box, the Head e-mail, and the May 16, 2009 interview with Burgess in a timely manner is a violation of its duty to disclose exculpatory information. To obtain a new trial for *Brady* violations, Appellants must show that "(1) evidence was suppressed; (2) the suppressed evidence was favorable to the defense; and (3) the suppressed evidence was material to either guilt or punishment." *Martin*, 431 F.3d at 850 (internal quotation marks and citation omitted). "Ordering a new trial based on *Brady* is only appropriate, however, where there exists a reasonable probability that had the evidence been disclosed the result at trial would have been different." *Id*. at 851 (internal quotation marks and citation omitted).

A "complaint that the government had the information for some time before disclosing it . . . does not, in itself, show a *Brady* violation." *United States v. Walters*, 351 F.3d 159, 169 (5th Cir. 2003). Rather, "the inquiry is whether the defendant was prejudiced by the tardy disclosure. If the defendant received the material in time to put it to effective use at trial, his conviction should not be

---

[4] In the alternative, Appellants urge us to adopt the position of the Ninth Circuit—that a prosecutor has a duty to investigate when he has a "strong suspicion" that a witness for the government has committed perjury. *See Morris v. Ylst*, 447 F.3d 735, 744 (9th Cir. 2006); *Commonwealth of N. Mariana Islands v. Bowie*, 243 F.3d 1109, 1117 (9th Cir. 2001). We do not dispute that such a duty may exist in certain situations. Here, the district court made no finding that the prosecution's degree of suspicion in this case approximated that found in *Bowie* and *Morris* and specifically found that the government did not know that Burgess's testimony was false until he confessed. Under these circumstances, we decline to extend the holdings of *Bowie* and *Morris* to this case.

No. 09-10064

reversed simply because it was not disclosed as early as it might have, and, indeed, should have been." *United States v. McKinney*, 758 F.2d 1036, 1050 (5th Cir. 1985).

Appellants maintain that the tardy disclosure of the materials prejudiced their ability to investigate Burgess's involvement in the Oxford fraud scheme. They argue that, had the materials been disclosed earlier, they would have obtained testimony from Burgess's other victims about his participation in the Oxford fraud scheme. The Head e-mail, however, provides a list of the victims of the Oxford fraud scheme. Appellants were able to identify Miarka and call her as a witness after comparing the Head e-mail with the May 16 interview notes. At trial, Appellants used Miarka's testimony and the documents she provided to cast considerable doubt on Burgess's credibility. Thus, the tardy disclosure of the materials does not appear to have prevented Appellants from putting them to fairly effective use. We have refused to find *Brady* violations in other situations where counsel is able to put exculpatory evidence to effective use, even if earlier disclosure may have provided additional benefit. *See*, *e.g.*, *United States v. O'Keefe,* 128 F.3d 885, 889 (5th Cir. 1997); *United States v. Randall*, 887 F.2d 1262, 1269 (5th Cir. 1989); *United States v. McKinney*, 758 F.2d 1036, 1050 (5th Cir. 1985).

Appellants' argument is further undercut by the fact that they did not request a continuance for additional time to investigate additional witnesses after the Miarka documents were disclosed at trial. Moreover, Siebert's counsel conceded at oral argument that Appellants never had obtained any new evidence that Burgess had secured the unwitting cooperation from innocent third parties as part of the Oxford fraud scheme. On balance, we cannot say that Appellants were prejudiced by the government's failure to turn over the materials earlier, though we agree with the district court that these materials should have been turned over in a more timely manner.

11

No. 09-10064

For the foregoing reasons, the judgment of the district court is hereby AFFIRMED.