IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 20, 2007

Charles R. Fulbruge III
Clerk

No. 05-30252

———————

UNITED STATES OF AMERICA

Plaintiff-Appellee-Cross-Appellant

v.

OTIS CHARLES JACKSON; TRINA RAUCHELL JACKSON

Defendants-Appellants-Cross-Appellees

JOHN TIMOTHY COTTON

Defendant-Appellant

———————

Appeals from the United States District Court
for the Western District of Louisiana
USDC No. 6:00-CR-60029-1-3

———————

Before DENNIS and PRADO, Circuit Judges, and ENGELHARDT, District Judge.[*]

PER CURIAM:[**]

———————

[*] District Judge of the Eastern District of Louisiana, sitting by designation.

[**] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

1

In this drug conspiracy case, Defendants-Appellants John Cotton, Trina Jackson (Cotton's wife), and Otis Jackson (Cotton's father-in-law and Trina's father) (collectively, "Defendants"), challenge the district court's denial of their motions for new trial based on newly discovered evidence. In addition, Otis Jackson challenges the district court's denial of his motion for new trial under Brady v. Maryland, 373 U.S. 83 (1963), as well as the sufficiency of the evidence for his conspiracy conviction. Finally, the United States ("the government") cross-appeals the sentences imposed upon Trina Jackson and Otis Jackson, contending that their sentences of 120 months are unreasonable. For the reasons that follow, we hold that the district court properly denied Defendants' motions for new trial and motions for hearings on their new trial motions. In addition, we find sufficient evidence to support Otis Jackson's conviction for conspiracy to possess with intent to distribute over fifty grams of cocaine base or crack. We conclude, however, that the district court applied sentences to Trina Jackson and Otis Jackson that were unreasonable under 18 U.S.C. § 3553(a). Therefore, we affirm all Defendants' convictions but vacate the sentences of Trina Jackson and Otis Jackson and remand to the district court for resentencing consistent with this court's opinion.

## I. FACTUAL AND PROCEDURAL HISTORY

By a superseding grand jury indictment returned on November 15, 2000, Defendants John Timothy Cotton ("Cotton"), Trina Rauchell Jackson ("Trina"), Otis Charles Jackson ("Otis"), and six co-defendants[1] were charged in a five-

---

[1] The six co-defendants, who are not parties to this appeal, are Jerry Palmer, Leslie Jackson, Thomas Latchie, Lester Davis, Hughy Brown, and Roberto Guzman Ortiz ("Roberto Guzman"). The district court granted Jerry Palmer's motion for mistrial, and the jury acquitted Leslie Jackson. Thomas Latchie, Hughy Brown, and Roberto Guzman all pleaded guilty, and the district court dismissed the conspiracy charge against Lester Davis on the

count indictment in the Lafayette-Opelousas Division of the Western District of Louisiana. The indictment alleged conduct spanning from 1990 to 2000 and involving the procurement and transportation of cocaine and cocaine base from Houston, Texas, the conversion of cocaine hydrochloride into cocaine base or crack, and the distribution of cocaine base in Louisiana, Texas, Mississippi, and Kansas.

Cotton was charged in all five counts of the indictment: (1) conspiracy to possess with intent to distribute over fifty grams of cocaine base or crack in violation of 21 U.S.C. §§ 841(a)(1), 846 (count 1); (2) possession with intent to distribute over fifty grams of cocaine base in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A), and 18 U.S.C. § 2 (count 2); (3) conspiracy to commit money laundering involving the proceeds of drug trafficking activity in violation of 18 U.S.C. § 1956(h) (count 3); (4) continuing criminal enterprise ("CCE") in violation of 21 U.S.C. § 848 (count 4); and (5) forfeiture of all property derived from drug proceeds to the United States under 21 U.S.C. § 853 (count 5). Trina was charged with conspiracy, money laundering, and forfeiture (counts 1, 3, 5). Only the conspiracy and forfeiture charges (counts 1 and 5) implicated Otis.

Defendants pleaded not guilty to the charges against them. Between July 26, 2004, and August 12, 2004, a jury trial was conducted. The government tried Trina and Otis on the conspiracy and forfeiture charges (counts 1 and 5) and Cotton on the conspiracy, CCE, and forfeiture charges (counts 1, 4, 5).[2]

At trial, the government sought to show that Cotton operated a cocaine

_____

government's motion.

[2] Prior to trial, the remaining counts of the indictment were dismissed on the motion of the government.

trafficking business in Houston, Texas, in which he was assisted by his wife and co-defendant, Trina, and his father-in-law and co-defendant, Otis. The government's case consisted of the testimony of 106 witnesses and the presentation of over one thousand exhibits. The government presented the following evidence:

Cotton's drug trafficking operation took place at the Pickfair Apartments, where Cotton lived with Trina and their five children. Cotton sold crack and powder cocaine from his and Trina's apartment. Cotton also "cooked" or converted powder cocaine into crack cocaine at his apartment, with the assistance of "Tank" Robicheaux. Cotton's "cooking" technique permitted him to stretch the powder cocaine so that a kilogram of powder cocaine would yield approximately two kilograms of crack. Otis rented an apartment next to Cotton and Trina's apartment, and the drug proceeds were stored in a safe located in Otis's apartment.

Cotton and his associates conducted their drug business in and around two automobile body shops owned in whole or in part by Cotton. These shops were known as "Houston Auto Works" and "Unified Auto Works." Cotton started Houston Auto Works at least in part with drug proceeds and started Unified Auto Works with co-defendant Jerry Palmer. Cotton maintained as many as eight "crack houses" used for the distribution of illegal narcotics in and around Houston and employed between fifteen and twenty people at these houses to sell drugs.

Cotton maintained a number of key relationships to assist him in his drug operation. David Thomas functioned as Cotton's lead associate in the early 1990s. At that time, Thomas was living near Cotton in the Pickfair Apartments with Leslie Jackson, who is Trina's sister and Otis's daughter, and their

children. Prior to his relationship with Cotton, Thomas had developed a relationship with certain individuals in the Dominican Republic, including Roberto Guzman,[3] who was Thomas's source for powder cocaine. Guzman became Cotton's supplier when Thomas and Cotton began trafficking drugs together. Guzman supplied Cotton with twelve to fourteen kilograms of powder cocaine each week. According to Guzman's testimony, this quantity increased after 1993 because Cotton had developed major clients outside of Houston. Guzman also testified that he sold drugs to Cotton on credit.

Guzman delivered the cocaine either to Cotton and Trina's apartment or to Thomas and Leslie's apartment. He testified that sometimes when he delivered the cocaine, he saw Trina at the apartment, and that if Cotton was unavailable, he would leave the drugs with her. Guzman also testified that when he went to the Pickfair Apartments to pick up his payment, Cotton retrieved the money from a safe located inside Otis's apartment. Otis was present on at least one occasion when this happened.

After Thomas and Cotton had a falling out and quit dealing drugs together,[4] Glenn "Slim" Bailey ("Bailey") began assisting Cotton in his drug operation. Bailey assisted Cotton with cooking the crack cocaine, conducting transactions with buyers on his own or with Cotton, and picking up drug couriers at the airport and transporting them either to Cotton's apartment or to Houston Auto Works for drug transactions.

On December 9, 1993, Cotton and Bailey were stopped by Houston police

---

[3] At trial, Guzman testified that his true name is "Rafael Fulgencio" and that "Guzman" is an alias he used in his drug business.

[4] Thomas testified that they quit dealing drugs together because he disagreed with Cotton's practice of involving his wife, Trina, in his drug business.

after narcotics officers observed them engage in hand-to-hand drug transactions. As a result of the stop, officers found approximately $10,000 in cash, $7,500 in traveler's checks, two firearms, and 26.3 grams of cocaine. According to the government, Cotton and Trina were concerned that Cotton would be incarcerated for a significant period of time, so Bailey took responsibility for the drugs.

Cotton and Trina were involved with "the Macara," an organization in the Dominican Republic that used "white magic" to invoke the protection and guidance of "spirits." Cotton became involved in the Macara through Guzman, who introduced Cotton to Maria Peralta and her husband, Jose Matos. Cotton and some other individuals involved in Cotton's drug operation each paid $8,500 to join the Macara. As part of the initiation ritual held in Houston, Peralta invoked the protection of the spirits for Cotton's organization against certain named law enforcement officers. Cotton and one of his co-conspirators, Dexter Harmon (one of Cotton's Louisiana buyers, discussed below), traveled to the Dominican Republic to participate in a special Macara cleansing ceremony after turmoil broke out in Cotton's organization as a result of allegations by Trina that a courier was stealing drug proceeds. In order to participate in the special ceremony, Cotton and Harmon paid Peralta an additional $17,000. Sometime subsequent to this special ceremony, Cotton, Trina, Guzman, Harmon, and one of Harmon's couriers named Oris "Soul Man" Boudreaux attended a festival in the Dominican Republic held at Peralta's house in honor of the Macara spirits.

Cotton had extensive clientele in Texas. Tron Washington purchased cocaine from Cotton, initially in smaller quantities but later in amounts up to a kilogram. In addition, Derrick Taylor began buying cocaine from Cotton in 1996 at the Pickfair Apartments and the body shops. On at least one occasion, Trina

facilitated a drug transaction between Taylor and Cotton; on another occasion, Taylor negotiated with Otis for the purchase of a kilogram of powder cocaine, but the deal never went through.

Cotton's Texas buyers also included Ronald Floyd, who bought eighteen ounces of crack from Cotton at Houston Auto Works twice a month for a period of six months in 1996, and Damien Porter from Pittsburgh, Texas, who on three occasions in 2000 met Cotton in Huntsville, where Cotton converted a kilogram of powder cocaine into 1.5 kilograms of crack. In addition, Cotton distributed significant quantities of cocaine to individuals in Austin, Texas, including Sedrick McArthur, who bought sixty-three ounces of crack cocaine from Cotton in 1995 in four separate transactions, and Aubry Hart, who purchased ten kilograms of cocaine from Cotton over the course of seven different transactions in 1996.

At least one of the individuals in Cotton's organization dealt exclusively with Trina. Regina Booker purchased crack from Trina on ten occasions in 1993 and 1994. The deals took place at the Pickfair Apartments, and each involved Booker's purchase of about twenty-eight grams of crack.

In addition to Cotton's Texas buyers, he maintained a significant drug distribution network in Louisiana. Merrick Young headed up one of Cotton's networks in Morgan City, Louisiana. Young used several couriers (including Eric Daniel, Patrick May, Adrienne May, Aldon Johnney, Marlon Haynes, Robert Bourgeois, and Chad Jones) to transport drugs from Cotton's Pickfair apartment or body shops in Houston to Morgan City.

Young used vehicles with hidden compartments to transport the drugs, including a blue Cutlass and a 1986 Buick Riviera, the latter of which was originally owned by Guzman. These vehicles were involved in various traffic

7

stops by Louisiana law enforcement. On June 27, 1994, police stopped Young near Morgan City and, using a drug sniffing dog, found a hidden compartment with $2,800 and a business card for Houston Auto Works. On November 16, 1995, police stopped Young's blue Cutlass, which was being driven by Robert Bourgeois, and found $23,760 in a secret compartment. On December 14, 1994, police again stopped Young, this time driving a green and white Chevrolet pickup truck, registered in Cotton's name, which also contained a secret compartment.

Dexter Harmon was another one of Cotton's significant drug customers in Rayne, Louisiana. Harmon met Cotton in late 1994 through Cotton's half-brother, Edwin Cotton. Harmon initially purchased his drugs from Edwin, who had obtained them from Cotton. However, after Cotton and Edwin had a falling out, Harmon began purchasing his supply directly from Cotton.

In early 1995, Cotton organized a meeting at Harmon's house to discuss setting up a drug transportation system along Interstate 10. Among those present were Cotton, Harmon, Young, and Guzman. The parties agreed that one of Young's couriers, Robert Bourgeois, would pick up drugs for Harmon in Houston and drop them off in Rayne. On the first trip, Bourgeois successfully dropped off 1.5 kilograms of crack cocaine in Rayne that he had picked up in Houston, but was stopped on the return trip by Louisiana police. The police seized $23,760, Harmon's payment to Cotton for the cocaine. Because of the loss of his payment, Harmon stopped using the transportation system involving Young's courier.

Harmon continued to buy cocaine from Cotton using his own courier, Boudreaux. Boudreaux testified that he made monthly trips to Houston to pick up kilograms of crack, which were, according to what Harmon told him, supplied

by Cotton. Boudreaux picked up drugs at Houston Auto Works, where he would drive around to the back of the shop and exchange cash for approximately two kilograms of crack per trip. He received the drugs from one of four or five different individuals who worked at the body shop. Although Boudreaux never received cocaine directly from Cotton, he observed Cotton at the shop during these transactions.

As discussed above, Harmon participated in the Macara organization activities along with Cotton, Trina, Guzman, and Boudreaux. At some point, Cotton advised Harmon that Maria Peralta, the Macara spiritualist, had stolen a large shipment of cocaine belonging to some Dominicans. Harmon received the bulk of the 200 to 250 kilograms stolen from this shipment. He assisted Cotton in delivering a portion of the proceeds from the sale of this stolen cocaine to Peralta by collecting as many $100 bills as he could. Harmon later witnessed this money being hidden in the roof of a Maxima automobile, which was later shipped to the Dominican Republic. Harmon testified that on one of his trips to the Dominican Republic, he saw the Maxima parked in Peralta's driveway.

In addition to Young and Harmon, Cotton's customers in Louisiana included Frager Ford, a distributor in Shreveport, Louisiana, who bought "big eight"[5] quantities of crack cocaine once a month in 1995 from Cotton at his apartment or Houston Auto Works, and Lester Davis, who distributed the drugs he purchased from Cotton in Alexandria, Louisiana.

Cotton also supplied drug dealers in Hammond, Louisiana, including Sam and Jeffrey Michelli. Jeffrey Michelli testified that he would set up drug transactions by calling Cotton and, on occasion, he would speak to Trina about

---

[5] This is a large crack cookie that weighs approximately 4.5 ounces.

what he needed. The transactions themselves were conducted at Cotton and Trina's apartment. Jeff Michelli testified that he occasionally observed Otis outside the apartment when he went to conduct his drug transactions. Trina was present when Cotton counted the money and when the drugs were exchanged. Jeffrey also testified that Trina took the counted money from Cotton and put it away in a bedroom. In 1994, Sam Michelli was stopped and arrested while he was transporting drugs he had obtained from Cotton.

Some of the drug dealers in north and central Louisiana purchased their drugs directly from Otis. Otis's buyers included Todd Phillips, who purchased a half kilogram of crack at the Pickfair Apartments twice in 1998, and Ellery Elie, who regularly bought up to one kilogram of powder cocaine once or twice a month from 1998 to 2000.

In addition to the Louisiana clientele, Cotton had customers in Mississippi. Luther Martin of Jackson, Mississippi, and Bruce Betts of Hattiesburg, Mississippi, both purchased cocaine from Cotton. Martin used several drug couriers to transport the drugs he bought from Cotton. When Martin purchased large quantities of crack from Cotton, these transactions were consummated at a motel on the south side of Houston. On several occasions, Trina delivered the drugs to Martin or his courier at the motel.

Betts became involved with Cotton through two of Martin's couriers, Buford Jefferson and Eddie McGee. Betts used Donna Burns and Kevin Newsome as his drug couriers. On December 6, 1993, Burns and Betts were arrested in the New Orleans airport after agents found twelve crack cocaine cookies taped to Burns's body. On May 26, 1995, Newsome was arrested in the same airport after a 0.25 kilogram of cocaine was found in his boot. These drugs came from Cotton.

Cotton also maintained a drug operation in Kansas. Hughy Brown traveled to Houston between one and three times a month.[6] When he dealt directly with Cotton, the drug transactions were conducted either at the Pickfair apartment, Houston Auto Works, or another house Cotton and Trina owned on Bell Street.

Brown testified that he dealt with Trina when Cotton was unavailable. On these occasions, Trina would receive Brown's payment or deliver the drugs, either at the Pickfair Apartments or Houston Auto Works. Brown also testified that on one occasion when he was at the Pickfair Apartments, he observed Otis handling jars and beakers in which crack cocaine was being cooked.

Brown testified that he paid cash the first year he bought drugs from Cotton, but subsequently, Cotton sold drugs to him on partial credit. Brown testified that he paid the balance by personally delivering payment or by sending Cotton a cashier's check. On one occasion, Brown wired $4,500 to Cotton using Western Union.

Photographs and telephone and wire transfer records supported the trial testimony of numerous witnesses. According to the telephone records, 246 calls were made between telephone numbers listed in Cotton's name and numbers listed in the name of Dexter Harmon or his business, and 246 calls were made between numbers listed in Cotton's name and those listed to either Hughy Brown or Brown's wife, Rhonetta Jones. The records also revealed fourteen calls from Cotton to Oris Boudreaux (Harmon's courier) and seventy-two calls from

---

[6] Brown came to know Cotton in an interesting way. While Brown was attending college in Wichita, Kansas, he learned that Houston was a major source city for drugs by conducting research at the school library. In 1994, he quit his job and drove to Houston to find a new drug source. After pursuing a series of leads, he met Glenn Bailey, and at some point, Bailey introduced Brown to Cotton.

11

Boudreaux to Cotton.

The wire transfer records confirmed that numerous individuals wired money to Cotton, Trina, or Otis. Cotton received ten wire transfers in his name totaling $26,938 from Dexter Harmon, Edwin Cotton, Merrick Young, Rhonetta Jones (Hughy Brown's wife), and others. Trina received six wires totaling $11,060 from Rhonetta Jones, Lester Davis, Merrick Young, and other individuals. Otis received fifteen wires totaling $42,160 from Jercy Davis, John Jackson, Lester Davis, and others.

On August 10, 2004, the government rested its case-in-chief. Defendants orally moved for judgments of acquittal, which the district court denied.

On August 12, 2004, the jury returned guilty verdicts against Cotton, Trina, and Otis on the conspiracy charge and a guilty verdict against Cotton on the CCE charge.[7] The jury also returned a forfeiture verdict against Cotton and Trina in the amount of $12 million.

On August 18, 2004, Cotton filed a motion for a judgment of acquittal as to the CCE count asserting insufficient evidence, and on August 19, 2004, he filed a motion for new trial on the same ground. On August 19, 2004, Otis moved for a judgment of acquittal, or alternatively for a new trial based on insufficient evidence. The district court denied these motions.

On October 26, 2004, the probation office issued its pre-sentence report ("PSR"). Using the November 5, 2003, version of the United States Sentencing Guidelines ("U.S.S.G."), the PSR concluded that Trina's Criminal History Category I and her offense level of 38 correlated to a sentencing range of 235 to

---

[7] Because of Cotton's conviction on the CCE charge, the district court granted the government's motion to dismiss the conspiracy count against Cotton to avoid double jeopardy issues.

293 months. The PSR recommended a sentencing range of 262 to 327 months for Otis based on his offense level of 38 and his Criminal History Category II. Although Otis did not file any objections to the PSR, Trina objected on two grounds. First, Trina asserted that she was entitled to a reduction under U.S.S.G. § 3B1.2 for her minor or minimal role in the offense. Second, she requested a downward departure from the Guidelines based on her lack of a criminal record and her status as a mother. The probation officer recommended that the district court overrule both of Trina's objections.

On January 26, 2005,[8] the district court sentenced Cotton to life imprisonment. After overruling Trina's objections to the PSR, the district court announced that it was going to deviate from the sentencing ranges recommended by the PSR for both Trina and Otis. The district court then sentenced both Trina and Otis to serve 120 months in prison and five years of supervised release. The government orally objected to both sentences.

On February 4, 2005, Cotton and Trina filed motions for new trial based on newly discovered evidence in the form of affidavits from eight inmates at the Federal Correction Center ("FCC") in Beaumont, Texas. On February 24, 2005, Otis filed a motion for new trial on the same ground. On August 1, 2005, the district court denied Defendants' motions for new trial.

The parties filed timely notices of appeal.[9] We have jurisdiction over these appeals under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(b).

---

[8] The district court initially convened a sentencing hearing on December 10, 2004, but it recessed in order to wait for the Supreme Court's anticipated ruling in United States v. Booker, 543 U.S. 220 (2005).

[9] On July 5, 2006, the Solicitor General granted written permission for the government to pursue its cross-appeal. See 18 U.S.C. § 3742(b).

## II. DISCUSSION

A.    New Trial Motions: Newly Discovered Evidence

1.    Parties' Arguments

Defendants argue that the district court abused its discretion in denying their motions for new trial based on newly discovered evidence under Federal Rule of Criminal Procedure 33(b)(1). This "newly discovered evidence" consists of affidavits by eight persons currently or formerly incarcerated in the FCC in Beaumont, Texas.[10] Collectively, the affidavits assert that a large group of inmates at the Beaumont FCC known as the "Hot Boyz" falsely testified in criminal trials in exchange for reduced sentences. According to the affidavits, the Hot Boyz received photographs and background information on people who were being investigated or who had been indicted from newspapers in the prison library and through the mail. The affiants allege that the Hot Boyz shared this information with other Hot Boyz, thereby permitting a Hot Boy to testify in a trial even if he did not know the individual being prosecuted. The affidavits maintain that the Hot Boyz contacted federal prosecutors and made up stories on those being prosecuted. According to the affidavits, it was common knowledge at the Beaumont FCC that the federal prosecutor in Lafayette, Louisiana, was giving time cuts to people who testified for him in court. Among the persons whom the affiants alleged to be Hot Boyz were David Thomas, Ernest Hamilton, Kenneth Coleman, Huey Jones, Donald Bell, Bill Davis, James Murphy, Tron Washington, Eric Daniels, and Bradford Earl Young. Seven of

---

[10] The eight affiants are Albert Duvall, Gregory Lewis, Anthony Coleman, Marquez Jones, Fedell Anderson, Purvis Cartwright, Brian Garrett, and Elluard Jackson. This new evidence was allegedly discovered by Dick DeGuerin, counsel for Jerry Palmer, the former co-defendant who was granted a mistrial. DeGuerin obtained the eight affidavits in support of his claim for attorney's fees under the Hyde Amendment.

these men testified at Defendants' trial.

Defendants argue that the testimony of the Hot Boyz witnesses was crucial to the government's case. Defendants assert that without this testimony, the government would not have been able to prove the elements of the charges against them. Both Cotton and Trina specifically object to the testimony of David Thomas, an alleged Hot Boyz witness. Cotton argues that Thomas's testimony was critical in finding him guilty of engaging in a CCE because only Thomas testified that Cotton had committed the alleged drug conspiracy in concert with five or more persons, over whom he exercised a managerial or supervisory role. Trina submits that Thomas's testimony was critical in convicting her of the alleged drug conspiracy because Thomas testified that he disagreed with Cotton's practice of involving his wife in his drug business.

Otis does not complain about any specific Hot Boyz witness, but generally contends that the testimony introduced by the government was tainted, thus entitling him to a new trial. In addition, both he and Cotton[11] point out that the district court granted a new trial in United States v. Colomb, 448 F. Supp. 2d 750 (W.D. La. 2006), an unrelated drug conspiracy case involving some of the same Hot Boyz witnesses. There, the district court based its decision to grant a new trial on a letter that an inmate had written to a federal prosecutor, in which the inmate alleged that one of the government's witnesses had offered to sell him pictures of some of the defendants in Colomb for the sum of $2,200. Id. at 753-56. The district court concluded that because the jury did not know about the inmate's letter, the jury did not have all the "information necessary to evaluate the credibility of the government inmate witnesses" and as a result, the

---

[11] Trina does not make this argument in her brief.

15

defendants in Colomb were "denied their basic right to a fair trial." Id. at 756. In a postscript to its ruling, the district court noted that since trial, one of the defendants had obtained an affidavit from another inmate alleging that some of the witnesses called by the government to testify against the Colombs, including Dexter Harmon (a government witness in this case), were sharing information in the Colomb case. Id. at 756-57. Also in its postscript, the district court noted that "[i]ssues that have arisen in this case—before trial, during trial and after trial—are troubling. . . . [O]ccurrences in this case suggest that a systemic problem may exist within the penal facilities operated by the Federal Bureau of Prisons." Id. at 757. Both Otis and Cotton argue that this case is similar enough to Colomb and involves the same concerns about witness collusion (and indeed a common witness, Dexter Harmon) expressed by the district court in Colomb, to warrant a new trial.

### 2.    Standard of Review

We review the district court's denial of a motion for new trial based on newly discovered evidence for abuse of discretion. United States v. Erwin, 277 F.3d 727, 731 (5th Cir. 2001). "Motions for new trial based on newly discovered evidence are 'disfavored and reviewed with great caution.'" United States v. Wall, 389 F.3d 457, 467 (5th Cir. 2004) (quoting Erwin, 277 F.3d at 731). To receive a new trial for newly discovered evidence, the defendant must prove that:

> (1) the evidence is newly discovered and was unknown to the defendant at the time of trial; (2) failure to detect the evidence was not due to a lack of diligence by the defendant; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) the evidence introduced at a new trial would probably produce an acquittal.

United States v. Infante, 404 F.3d 376, 387 (5th Cir. 2005) (internal quotation

marks omitted). "If the defendant fails to demonstrate any one of these factors, the motion for new trial should be denied." Wall, 389 F.3d at 467.

### 3. Analysis

The district court denied Defendants' motions for new trial because it determined that Defendants could not prove all of the factors necessary to receive a new trial. Specifically, the district court concluded that the affidavits were "merely impeachment evidence" and that "this impeachment evidence does not have any tendency to undermine the outcome at trial." The district court further held "that in light of the overwhelming evidence presented at the three-week trial of defendants, and the questionable credibility of the affiants' proffered testimony, a new trial would probably not result in an acquittal of any of these three defendants."

We conclude that the district court did not abuse its discretion in denying Defendants' motions for new trial because Defendants cannot satisfy all five of the factors required for a new trial based on newly discovered evidence. See Wall, 389 F.3d at 467. Specifically, Defendants cannot prove that the evidence is not merely cumulative or impeaching or that the evidence would probably produce an acquittal if introduced at a new trial. See Infante, 404 F.3d at 387.

First, as the district court concluded and the government argues, these affidavits are merely impeachment evidence. In reviewing the affidavits, it is clear that they could be used to challenge only the veracity of the Hot Boyz witnesses' testimony. The affidavits do not purport to exonerate Defendants, but rather contain vague allegations about witness collusion. Further, none of the affidavits specifically alleges that any of the Hot Boyz witnesses fabricated or

provided false testimony against Cotton, Trina, or Otis.[12] Accordingly, this "new evidence" is merely impeachment evidence and thus insufficient to entitle Defendants to a new trial. See Wall, 389 F.3d at 470; see also United States v. Pena, 949 F.2d 751, 758 (5th Cir. 1991) ("Evidence which merely discredits or impeaches a witness' testimony does not justify a new trial.").

Second, Defendants cannot show that the affidavits are not merely cumulative evidence. The record reflects that all of the Hot Boyz witnesses who testified at trial were cross-examined by at least one defense attorney—and sometimes more than one—about various topics related to possible witness collusion. The record reflects that these questions included (as summarized by the government):

> whether they were ever housed at the same facility with other [government] witnesses, whether they received a packet of grand jury testimony or lineup photos from the prosecutor before trial, the contents of which could be shared with or viewed by other witnesses, whether they in fact discussed this case with fellow inmate-witnesses, whether they ever observed photographs of the defendants being passed around the prison, and whether they had ever heard other inmates talk about receiving sentence reductions in exchange for testimony.

Thus, defense counsel already had an opportunity to cross-examine the alleged Hot Boyz witnesses on these points, effectively putting the issue of witness collusion before the jury. Any further exploration of these questions would be cumulative.

Third, as the district court concluded and as the government argues,

---

[12] The only person identified in the affidavits by name against whom testimony was supposedly fabricated was Jerry Palmer, whose case was severed from Cotton and the Jacksons early in the trial and against whom charges were ultimately dismissed on the motion of the government.

Defendants cannot prove that the affidavits would have probably produced an acquittal if introduced at a new trial. The testimony of the seven Hot Boyz witnesses does not appear to be critical in sustaining Defendants' convictions for at least two reasons. First, the Hot Boyz witnesses either provided very limited testimony or provided testimony limited to certain time periods of the alleged ten-year conspiracy. Bradford Young, Eric Daniels, and Tron Washington offered very limited testimony regarding transactions with Cotton, and they did not testify against Trina or Otis.[13] The testimony of Bill Davis and David Thomas, who provided more substantial testimony against Defendants, was limited to certain time periods of the alleged ten-year conspiracy (Bill Davis: six months in 1994-95; David Thomas: stopped trafficking with Cotton in 1994). Second, for those Hot Boyz who provided more substantial testimony, their testimony was corroborated by the testimony of government witnesses who are not alleged to be Hot Boyz. Derrick Taylor, Sam Michelli, Jeffrey Michelli, and Roberto Guzman identified David Thomas as being involved in Cotton's operation. Similarly, Patrick May, Edwin Cotton, Willie Senegal, and Jason Senegal confirmed Bill Davis's involvement in the conspiracy. Thus, Defendants' association with some of the alleged Hot Boyz witnesses was confirmed by government witnesses who had nothing to do with the Hot Boyz.

Even without the testimony of the Hot Boyz witnesses, there is considerable evidence of Defendants' guilt. Reflecting this fact, the district court concluded that, "in light of the overwhelming evidence presented at the three-week trial . . . a new trial would probably not result in an acquittal of any of

---

[13] Ernest Hamilton, another Hot Boy, testified only with regard to drug transactions with Jerry Palmer and specifically denied ever dealing directly with Cotton.

these three defendants." A review of the evidence confirms the district court's conclusion that there is ample evidence even outside of the disputed testimony. Cf. Wall, 389 F.3d at 471-72 (finding considerable evidence of the defendant's guilt outside of the disputed testimony).

The essential elements of a drug conspiracy are that the defendant "(1) agreed with at least one other person; (2) possessed with the intent to distribute a controlled substance; (3) knew the conspiracy existed; and (4) participated intentionally in the conspiracy." United States v. German, 486 F.3d 849, 852 (5th Cir. 2007). For Trina's conspiracy conviction, there is sufficient evidence of Trina's guilt even without David Thomas's testimony. The government presented evidence that Trina was at her shared apartment with Cotton when cocaine was delivered and when drug purchases were consummated (testimony of Roberto Guzman and Jeffrey Michelli), that Trina was there to receive the drugs and drug money (testimony of Roberto Guzman, Jeffrey Michelli, and Hughy Brown), and that if Cotton was unavailable, Trina filled in for him (testimony of Roberto Guzman, Derrick Taylor, Jeffrey Michelli, Luther Martin, Hughy Brown, and Aldon Johnney). In addition, Regina Booker testified that she dealt exclusively with Trina and purchased crack from Trina at the Pickfair Apartments on ten occasions in 1993 and 1994. This testimony was corroborated by photographs of Trina with the witnesses, telephone records, and wire transfer documents.

There is also sufficient evidence to support Otis's conspiracy conviction, even without the testimony of Hot Boyz witnesses. The government set forth evidence that Otis was present at the Pickfair Apartments when drug deals were consummated (testimony of Roberto Guzman and Jeffrey Michelli), that on one occasion, Otis was observed handling jars and beakers in which crack cocaine

was being cooked (testimony of Hughy Brown), and that the safe with the drug proceeds was located inside of Otis's apartment (testimony of Roberto Guzman). Moreover, Todd Phillips and Stephen Taylor, neither of whom is an alleged Hot Boy, testified that they purchased crack from Otis. Phillips testified that his two transactions were consummated at the Pickfair Apartments in 1998, and Taylor testified that he purchased between eighteen ounces and one kilogram of crack from Otis on four occasions in early 1997. This testimony was corroborated by wire transfer documents, which confirmed that Otis received fifteen wires from known co-conspirators.

For Cotton's CCE conviction, the government must prove beyond a reasonable doubt that, inter alia, Cotton organized, supervised, or managed at least five persons who acted in concert with him. See 21 U.S.C. § 848(c); United States v. Fuchs, 467 F.3d 889, 903 (5th Cir. 2006). "The 'in concert with' requirement implies that the five individuals must have agreed to participate in the criminal enterprise. Thus, an innocent participant acting without criminal intent cannot be counted as one of the five individuals in the CCE." Fuchs, 467 F.3d at 903 (internal citations omitted).

The defendant may possess managerial authority over an individual for purposes of the CCE statute even if that person worked for one of the defendant's subordinates: "The fact that [the defendant] did not directly control the actions of many of these individuals is irrelevant; that their actions were directly supervised or managed by individuals to whom [the defendant] delegated authority indicates that [the defendant] organized, supervised, or managed them for purposes of § 848." United States v. Garcia Abrego, 141 F.3d 142, 165 (5th Cir. 1998).

21

In counting the five or more persons under the CCE statute, the government must have shown that the defendant had more than a mere buyer-seller relationship. See United States v. Bass, 310 F.3d 321, 327 (5th Cir. 2002). "[D]efendants have been found to possess the level of control prescribed by the CCE statute—and thus to go beyond a mere buyer-seller relationship—when they rented vehicles for others selling drugs, used salesmen to distribute drugs, used enforcers, used drug couriers, provided financial and logistical support to suppliers and purchasers, and used collection agents to obtain drug payments." Id. (internal citations omitted).

We find ample support for the district court's conclusion that a new trial would probably not result in Cotton's acquittal of his CCE conviction. In addition to the disputed testimony of David Thomas, the government presented the following evidence to show that Cotton directed the activities of five or more individuals: (1) Trina acted on Cotton's instructions and filled in for Cotton when he was unavailable (testimony of Roberto Guzman, Derrick Taylor, Jeffrey Michelli, Luther Martin, Hughy Brown, and Aldon Johnney); (2) Otis stored drug proceeds for Cotton in his apartment, sold drugs supplied by Cotton, and handled jars and beakers in which cocaine was being cooked (testimony of Roberto Guzman and Hughy Brown); (3) "Tank" Robicheaux cooked cocaine at Cotton's direction (testimony of Roberto Guzman and Frager Ford); (4) Glenn Bailey met drug couriers at the airport and transported them to the body shop to pick up drugs from Cotton; and (5) Dexter Harmon traveled to Kansas on behalf of Cotton to negotiate a new cocaine price with Hughy Brown, attended a meeting that Cotton organized to set up a drug transportation system along Interstate 10, and gathered money at Cotton's direction to pay Maria Peralta for stolen cocaine. The government submitted evidence that because Cotton

directed the activities of Dexter Harmon, Cotton also directed the activities of Harmon's subordinates, Oris Boudreaux, Bill Davis, Jason Senegal, and Willie Senegal. See Garcia Abrego, 141 F.3d at 165. Finally, the government introduced evidence that Cotton directed the activities of a number of unnamed individuals based on the following evidence: (1) Oris Boudreaux testified that when he went to Houston Auto Works to pick up drugs, one of four or five different individuals would let him into the fenced area in the back of the body shop and would exchange the drugs for cash; (2) Roberto Guzman testified that Cotton maintained between seven and eight crack houses; (3) Kevin Newsome testified that on one trip to pick up drugs, he was met at the hotel by a woman other than Trina; (4) Bruce Betts testified that when he called the body shop to place an order for drugs, he would speak to different individuals; and (5) Anthony Burgess testified that on his first trip to the body shop, he observed multiple individuals hanging around Cotton and helping him cook crack. In light of all of this evidence, there is sufficient support for Cotton's CCE conviction, even without the testimony of David Thomas and the other Hot Boyz witnesses.

Finally, Cotton and Otis's argument regarding the district court's ruling in Colomb does not lend any additional support to their argument that the district court abused its discretion. In Colomb, the district court based its decision to grant a new trial on the existence of an inmate letter containing specific information about a government witness. Colomb, 448 F. Supp. 2d at 753-56. There is no inmate letter in this case, and the inmate affidavits, as discussed above, do not contain any allegations that the government witnesses in this case fabricated or falsified testimony or shared information against

Cotton, Trina, or Otis specifically.

In addition, although the district court's postscript in Colomb mentions Dexter Harmon (a witness in this case) as one of the government witnesses sharing information, the district court in Colomb did not make any specific findings on Harmon or indicate whether he was involved in information sharing in any other case, including this one. Id. at 756-58.[14]

Even if this court were to consider the proceedings in an unrelated prosecution as "new evidence" to support Defendants' motion for new trial, Defendants still have not established that these proceedings, if introduced at a new trial, would probably produce an acquittal. Accordingly, we hold that the district court did not abuse its discretion in denying Defendants' motions for new trial based on newly discovered evidence.

B.   New Trial Motions: Denial of Hearing

Trina summarily asserts in her brief that the district court abused its discretion in denying a hearing on her motion for new trial. In his brief, Cotton adopts the arguments of his co-defendants, so presumably he is making this same argument.

We review the district court's decision to deny a motion for new trial without a hearing for abuse of discretion. United States v. Blackthorne, 378 F.3d 449, 455 (5th Cir. 2004). "Generally, a motion for new trial may be decided upon affidavits without an evidentiary hearing." Id. at 455-56 (internal quotation marks omitted). The need for a hearing is especially diminished when the judge

---

[14] The government notes that Harmon's testimony in this case is corroborated by that of his courier, Oris Boudreaux, and other witnesses such as Roberto Guzman, Willie Senegal, Jason Senegal, Robert Bourgeois, and Edwin Cotton, and with photographs, money orders, wire transfers, passport entries, and telephone records.

who rules on the motion for new trial is the same judge who presided over the trial and observed the witnesses testify. See id. at 456 n.10.

The district court here tried the case and heard the post-trial motions, so it had familiarity with the witnesses and the evidence, which amounts to personal knowledge that can ordinarily substitute for an evidentiary hearing. Cf. id. at 456. Because Trina and Cotton have offered no argument to justify deviation from this general rule, we conclude that the district court did not abuse its discretion in denying a hearing on the motions for new trial. See United States v. Runyan, 290 F.3d 223, 248 (5th Cir. 2002).

C.    New Trial Motion: Otis Jackson's Brady Claim

In his reply brief, Otis characterizes the newly discovered evidence underlying his motion for new trial as evidence that should have been produced by the government under Brady v. Maryland, 373 U.S. 83 (1963), and Kyles v. Whitley, 514 U.S. 419 (1995). According to Otis, the federal prosecutor in this case knew that the testifying inmates were circulating information about pending prosecutions, including photographs of the defendants, line-ups, and indictments. Otis argues that the government had a constitutional obligation under Brady to disclose any communications with jailhouse informants. Otis contends that before ruling on his motion for new trial, the district court should have conducted an in camera inspection of the government's files for letters from prisoners offering their testimony in exchange for reduced sentences. The government did not respond to this argument in either of its briefs, but at oral argument, the government's attorney denied that prosecutors had any knowledge, at the time of trial, of improper communications involving government witnesses.

This court reviews the district court's denial of a motion for new trial de novo if the reason for the new trial motion is an alleged Brady violation. Runyan, 290 F.3d at 247. Brady claims are reviewed using a three-part test, under which the defendant must show that: "(1) evidence was suppressed; (2) the suppressed evidence was favorable to the defense; and (3) the suppressed evidence was material to either guilt or punishment." Id. (citing Brady, 373 U.S. at 87). "Evidence is material under Brady when there is a 'reasonable probability' that the outcome of the trial would have been different if the evidence had been disclosed to the defendant." Id. (citing United States v. Bagley, 473 U.S. 667, 682 (1985)). "A 'reasonable probability' is established when the failure to disclose the suppressed evidence 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" Id. (quoting Kyles, 514 U.S. at 435). Accordingly, in order to prevail on this claim, "the defendant must establish that the suppression of exculpatory evidence by the government undermines confidence in the outcome of the trial." Id. (internal quotation marks omitted).

Otis maintains that there can be no doubt that the government's files contain communications with inmate witnesses because the inmate witnesses admitted to writing the prosecutor and offering their testimony. Even if Otis's speculation about the contents of the government's files turned out to be true, his Brady claim still lacks merit.

First, at least one government inmate witness (Stephen Taylor) admitted at trial to writing the federal prosecutor and offering to testify. Accordingly, Otis's defense counsel could have obtained the information contained in any inmate-government correspondence by further cross-examining the government

inmate witnesses on the stand. Cf. United States v. Dixon, 132 F.3d 192, 199 (5th Cir. 1997) ("Brady does not obligate the government to produce for [a defendant] evidence or information already known to him, or that he could have obtained from other sources by exercising reasonable diligence.") (internal quotation marks omitted).

Second, even assuming that the government's files did contain correspondence that it was obliged to disclose under Brady, Otis has not shown that these allegedly suppressed communications are material under the Brady standard because he has not demonstrated that there is a reasonable probability that, had the evidence been disclosed to the defense, the result would have been different. See United States v. Maloof, 205 F.3d 819, 827 (5th Cir. 2000) (citing Bagley, 473 U.S. at 682-83). Stated differently, Otis has not shown that the suppression of the alleged inmate-government correspondence undermines confidence in the outcome of the trial. See Runyan, 290 F.3d at 247 (citing Kyles, 514 U.S. at 434); see also United States v. Kates, 174 F.3d 580, 583 (5th Cir. 1999) ("'The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense.'") (quoting United States v. Agurs, 427 U.S. 97, 109-10 (1978)).

Thus, we hold that the district court did not err in denying Otis's motion for new trial based on Brady.[15]

---

[15] We observe that Otis did not raise this argument in his opening brief, cf. United States v. Fields, 483 F.3d 313, 352 n.36 (5th Cir. 2007) (concluding that since the defendant did not raise his attorney misconduct-accusation claim in his opening brief, it "is effectively waived") (citing United States v. Jackson, 426 F.3d 301, 304 n.2 (5th Cir. 2005)), but he did make this argument in his February 24, 2005, motion for new trial before the district court. Because we find this claim lacks merit, we need not decide whether it was waived.

D.    Sufficiency of the Evidence to Support Otis Jackson's Conspiracy Conviction

Otis challenges the sufficiency of the evidence underlying his conviction for conspiracy to possess with intent to distribute over fifty grams of cocaine base or crack.   According to Otis, the evidence supporting his conviction was insufficient to show any overt act on his part or any sort of agreement between him and his co-defendants to distribute cocaine base or crack, two essential elements of the conspiracy offense. Otis maintains that his familial association with Cotton and Trina and his mere presence at the Pickfair Apartments are not enough to prove his involvement in the conspiracy.

We review a challenge to the sufficiency of the evidence supporting a conviction de novo, considering whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.   See German, 486 F.3d at 852.  All reasonable inferences from the evidence must be construed in favor of the jury verdict, and the determination of witness credibility is the province of the jury.   Id.   "The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, and the jury is free to choose among reasonable constructions of the evidence."   Infante, 404 F.3d at 384-85 (internal quotation marks omitted).

To prove the offense of conspiracy to possess with intent to distribute a controlled substance, the government must establish: "(1) the existence of an agreement between two or more persons to violate narcotics laws, (2) the defendant's knowledge of the conspiracy, and (3) the defendant's voluntary participation in the conspiracy."   Fuchs, 467 F.3d at 908. "An express agreement is not required; a tacit, mutual agreement with common purpose, design, and understanding will suffice."   Infante, 404 F.3d at 385.   "Moreover, because

secrecy is the norm in drug conspiracies, each element of the crime may be established by circumstantial evidence." Id.

Although "[t]he defendant's knowledge of and participation in the conspiracy may be inferred from a collection of circumstances," "[m]ere presence or association alone . . . [is] not sufficient to prove participation in a conspiracy." Fuchs, 467 F.3d at 908 (internal quotation marks and citations omitted). However, to be convicted of engaging in a criminal conspiracy, the defendant "need not know all the details of the unlawful enterprise or know the exact number or identity of all the co-conspirators, so long as he knowingly participates in some fashion in the larger objectives of the conspiracy." Garcia Abrego, 141 F.3d at 155 (internal quotation marks omitted). In addition, "a conviction may be sustained solely on the basis of the testimony of a coconspirator—even a coconspirator who testifies on the basis of a plea bargain or promise of leniency—so long as that testimony is not incredible as a matter of law—that is, so long as it does not defy the laws of nature or relate to matters that the witness could not have observed." Id. at 155-56.

The record contains sufficient evidence to support the jury's conclusion that Otis engaged in a conspiracy to possess with intent to distribute over fifty grams of cocaine base or crack. As detailed above, the government introduced the testimony of individuals who alleged that they purchased crack cocaine from Otis on various occasions during the time period of the conspiracy (testimony of Todd Phillips and Stephen Taylor), or who alleged that they observed Otis outside of the Pickfair Apartments when drug transactions were taking place (testimony of Roberto Guzman and Jeffrey Michelli). In addition, the government presented the testimony of Glenn Bailey, who alleged he sold

crack to Otis; Hughy Brown, who alleged that he observed Otis handling jars and beakers in which crack cocaine was being cooked; and Roberto Guzman, who alleged that the safe Cotton used for drug proceeds was located inside of Otis's apartment and that Otis was present on at least one occasion when Cotton retrieved money from the safe. This testimony, when viewed in the light most favorable to the prosecution, sufficiently supports the jury's verdict.

Moreover, some of the witnesses' accounts were corroborated by the wire transfer records showing a connection between Otis and known drug dealers. These records reveal that Otis received fifteen wires totaling $42,160 from Jercy Davis, Lester Davis, John Jackson, and others. Jercy Davis is the spouse of Lester Davis, a drug dealer who sometimes used the alias "John Jackson" when wiring money to Otis. The government also introduced evidence that Otis subsequently endorsed some of the Western Union checks over to Cotton. Accordingly, the jury could have reasonably inferred that Otis was paying Cotton for the drugs he had purchased. Cf. Infante, 404 F.3d at 386 (finding testimony of co-conspirator was corroborated by telephone records).

Finally, although Otis correctly asserts that his conspiracy conviction cannot be based solely on the existence of familial relationships or upon his mere presence, "[i]nferences drawn from familial relationships or mere knowing presence . . . may be combined with other circumstantial evidence to support a conspiracy conviction." United States v. Broussard, 80 F.3d 1025, 1031 (5th Cir. 1996). The government presented evidence not only of Otis's relationship to Cotton and Trina, but also that he lived in the Pickfair Apartments next to Cotton and Trina. There was evidence that drug transactions were routinely conducted at the Pickfair Apartments. In addition, the jury heard evidence that Cotton had access to Otis's apartment and the safe located therein, even when

Otis was not there. Finally, the government set forth Roberto Guzman's testimony that he overheard Otis and Cotton at the body shop discussing a drug-related trip Otis had made to south Louisiana.

Given all of this evidence, the jury could have concluded that Otis was a knowing member of the conspiracy, instead of a solo dealer in drugs. Accordingly, we hold that there is sufficient evidence to support the jury's verdict on Otis's conspiracy conviction.

E.    Reasonableness of Sentences for Trina Jackson and Otis Jackson under 18 U.S.C. § 3553(a)

1.    Parties' Arguments

In its cross-appeal, the government challenges the non-Guidelines sentences imposed upon Trina and Otis by the district court as being unreasonable under the factors in 18 U.S.C. § 3553(a). According to the government, these sentences are unreasonable because the district court focused on impermissible factors and failed to properly consider the factors specified in § 3553(a). The government argues that the 120-month sentences imposed upon Trina and Otis are 49% and 54% deviations, respectively, from the low end of the advisory Guidelines ranges. In addition, the government contends that the district court's sentencing decisions are not informed by the decisions of this circuit both before and after Booker.

Trina and Otis counter that the district court sufficiently considered the § 3553(a) factors and did so in haec verba. According to Trina and Otis, the district court thoroughly articulated its reasons for deviating below the sentencing ranges assigned by the PSR.

2.    Analysis

This court reviews the district court's factual findings in connection with

sentencing for clear error and the application of the Guidelines de novo. See United States v. Guidry, 462 F.3d 373, 375 (5th Cir. 2006). We review the ultimate sentence imposed by the district court for "unreasonableness," an inquiry guided by the factors in § 3553(a). See United States v. Smith, 440 F.3d 704, 706 (5th Cir. 2006). These factors include:

> (1)    the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2)    the need for the sentence imposed—
>> (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B)    to afford adequate deterrence to criminal conduct;
>> (C)    to protect the public from further crimes of the defendant; and
>> (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (3)    the kinds of sentences available;
> (4)    the kinds of sentence and the sentencing range established for—
>> (A)    the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . .;
> (5)    any pertinent policy statement—
>> (A)    issued by the Sentencing Commission . . .;
> (6)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
> (7)    the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). A sentence within the statutory Guidelines supports a presumption of reasonableness on appellate review. Rita v. United States, 127 S. Ct. 2456, 2462-66 (2007); United States v. Mares, 402 F.3d 511, 519-20 (5th Cir. 2005). However, a non-Guidelines sentence does not support a presumption

of unreasonableness. Rita, 127 S. Ct. at 2467.

"Where, as here, a district court imposes a post-Booker non-Guidelines sentence . . . we conduct our reasonableness review through an abuse-of-discretion lens, paying particular attention to the specific reasons given for deviating from the Guidelines." United States v. Armendariz, 451 F.3d 352, 358 (5th Cir. 2006) (citing United States v. Reinhart, 442 F.3d 857, 862 (5th Cir. 2006)); see also Rita, 127 S. Ct. at 2472 ("Guided by [the] § 3553(a) factors, Booker's abuse-of-discretion standard directs appellate courts to evaluate what motivated the District Judge's individualized sentencing decision.").

"The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority." Rita, 127 S. Ct. at 2468. "Sometimes the circumstances will call for a brief explanation; sometimes they will call for a lengthier explanation. Where the judge imposes a sentence outside the Guidelines, the judge will explain why he has done so." Id. "When the district court imposes a non-Guideline sentence, it 'must more thoroughly articulate its reasons' for doing so, and the greater the difference between the sentence and the Guideline range, 'the more compelling the justification based on factors in section 3553(a) must be.'" Guidry, 462 F.3d at 376 (quoting Smith, 440 F.3d at 707).[16]

In the Fifth Circuit, a non-Guidelines sentence is unreasonable if it: "(1)

---

[16] A number of other circuits apply this "proportionality" approach, see Rita, 127 S. Ct. at 2467 (citing the First, Fourth, Fifth, Sixth, Seventh, Eighth, Tenth, and Eleventh Circuits), and the Supreme Court is currently considering a case involving the question of whether federal appellate courts may require stronger justifications for greater deviations from the Guidelines. See Gall v. United States, 127 S. Ct. 2933 (2007) (argued October 2, 2007).

does not account for a factor that should have received significant weight, (2) gives significant weight to an irrelevant or improper factor, or (3) represents a clear error of judgment in balancing the sentencing factors." Smith, 440 F.3d at 708.[17]

        a.     Trina Jackson's Sentence

        i.     <u>District Court's Sentencing</u>

In sentencing Trina, the district court found that the applicable Guideline range was 235 to 293 months. The district court then began its sentencing colloquy by stating that it would not only consider the Sentencing Guidelines but that it would give them considerable weight. The district court then proceeded to point out a number of issues with the case that it found "disturbing." First, the district court noted that Trina's relative culpability was minor in comparison to Cotton's culpability. Second, the district court noted that Trina has five children, and that it had just sentenced her husband and the children's father, Cotton, to life imprisonment. Finally, the district court noted that Trina had no criminal history record and no substance abuse problem. The district judge reasoned that

> based on everything that I've heard, that the guidelines of 235 to 293 months is not an appropriate sentence . . . . [I]t seems to me that a sentence of 120 months would be appropriate for this defendant. It would serve society's purpose in punishing her. It

---

[17] But see Rita, 127 S. Ct. at 2473 (Stevens, J., concurring) ("Matters such as age, education, mental or emotional condition, medical condition (including drug or alcohol addiction), employment history, lack of guidance as a youth, family ties, or military, civic, charitable, or public service are not ordinarily considered under the Guidelines. These are, however, matters that § 3553(a) authorizes the sentencing judge to consider. As such, they are factors that an appellate court must consider under Booker's abuse-of-discretion standard.") (internal citations omitted).

would tend to deter conduct of others who might want to get involved with this kind of thing. It's not a little thing when you say ten years.

After again alluding to Trina's culpability as compared to Cotton's and Trina's status as a mother, the district judge concluded that

it just seems appropriate under all the circumstances in my duty as a judge to fashion an appropriate sentence in keeping with Booker and Fanfan. So I will deviate from the [U.S.S.G.] for the reasons that I've stated and I'm going to go ahead and impose a sentence of 120 months.

### ii.    Discussion

Under this circuit's post-Booker precedent, the district court's non-Guidelines sentence of 120 months for Trina is unreasonable because it relies on improper or irrelevant factors and failed to take into account relevant statutory factors. The district court assigned significant weight to improper or irrelevant factors, including:

•Relative culpability: Although the district court denied Trina's objection that she was entitled to a reduction under U.S.S.G. § 3B1.2 for her minor or minimal role in the offense,[18] the district court still proceeded to deviate from the Guidelines in part because Trina's culpability was minor compared to that of Cotton. The district court should have explained its apparently contradictory position on the culpability issue. Cf. United States v. Duhon, 440 F.3d 711, 717 (5th Cir. 2006) (noting that the district court should have explained why it relied on the defendant's back injury for its sentencing deviation, where it had earlier acknowledged that the Guidelines would not

---

[18] The district court denied Trina's request for a mitigating role reduction under U.S.S.G. § 3B1.2 on the ground that "relative to Mr. Cotton, she's minor, but as far as the law is concerned, I don't find her to be minor."

permit a departure based on the defendant's physical condition).

• Criminal history: In deviating from the Guidelines range in part because Trina had no criminal history, the district court (1) failed to acknowledge that Trina's criminal history was already taken into account in the calculation of her Guidelines range, and (2) failed to articulate why placing extra weight on a factor already taken into account by the Guidelines was appropriate in this case. Cf. United States v. Perrin, 478 F.3d 672, 678 (5th Cir. 2007) (concluding that it was inappropriate for the district court to consider factors that were already accounted for in determining the Guidelines range). Moreover, the district court failed to acknowledge U.S.S.G. § 4A1.3(b)(2)(A), which prohibits the court from departing from the lower limit of the applicable Guidelines range when the defendant has a criminal history score of Category I. Cf. Armendariz, 451 F.3d at 359 (concluding that a sentence was unreasonable where the district court did not, among other things, account for pertinent policy statements in the Guidelines) (citing 18 U.S.C. § 3553(a)(5)).

• Family circumstances: The district court also justified Trina's sentence in significant part on the fact that Trina has five children and that her husband and the father of the children, Cotton, had been sentenced to life imprisonment. Family responsibilities are a discouraged factor under the Guidelines. See U.S.S.G. § 5H1.6 ("[F]amily ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted."). In considering Trina's family circumstances, the district court erroneously failed to acknowledge and consider the policy statement in § 5H1.6. See Guidry, 462 F.3d at 377 (noting that the district court "failed to acknowledge the [§ 5H1.6] policy statement or to give any indication that Guidry's family ties are somehow

extraordinary such that the policy statement would not apply").

Also, the district court failed to consider other factors in § 3553(a), which this court has concluded are relevant:

• Culpability: In light of the considerable testimony at trial regarding Trina's involvement in the conspiracy, the district court's sentence failed to give sufficient weight to "the nature and circumstances of the offense" under § 3553(a)(1). Cf. Guidry, 462 F.3d at 377 (concluding that the district court's finding that Guidry was not a full-time drug dealer was belied by the evidence in the record and testimony at trial). Here, the sentence imposed by the district court is commensurate with the Guidelines sentence applicable to someone who has trafficked only thirty-five to fifty grams of crack; the amount that Trina personally sold to Regina Booker alone is more than five times this amount.

• Disparity: The district court failed to consider that the sentence it imposed, which constituted a 49% reduction from the Guidelines minimum, would create significant disparity between Trina and other defendants with similar criminal histories convicted of similar offenses. See Guidry, 462 F.3d at 378 (holding that the district court's failure to give consideration to the sentencing disparity that would result was another reason the defendant's sentence was unreasonable); cf. Rita, 127 S. Ct. at 2464-65 ("[I]t is fair to assume that the Guidelines, insofar as practicable, reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.").

Trina's sentence is unreasonable because the district judge considered disfavored factors and ignored relevant ones. Therefore, we vacate and remand for resentencing.

### b.     Otis Jackson's Sentence

### i.     <u>District Court's Sentencing</u>

In sentencing Otis, the district court first noted that the applicable sentencing range was 262 to 327 months. The district judge then stated,

> I'm not only going to consider [the Guidelines], but I'm going to give significant weight to those guidelines, but I'm also going to follow the mandate that I was given, I believe, as the district judge to tailor each sentence based upon the particular facts of the case and the real conduct, real criminal conduct that the Court finds.

In fashioning Otis's sentence, the district court provided three reasons for deviating from the Guideline range. First, the district court expressed concern over the effect on the jury of its decision to admit evidence of Otis's other crimes under Federal Rule of Evidence 404(b). The district judge explained:

> I made a ruling over the objection, I believe, of defense counsel about the allowance of 60 pounds or 62.5 pounds or whatever of marijuana . . . [t]hat the defendant was convicted of possessing. . . . And I allowed the jury to know about that over the defendant's objection, I believe. And I think it was the right decision on the law, but I am struck in my view that without that, the jury not having notice of that conviction during this period . . . and I can't say that the jury wouldn't have found him guilty because there was other evidence there. I think that's clear. But when we get back, it would have been more interesting probably or more difficult . . . for the jury to do whatever the jury was going to do.[19]

Second, the district court justified its sentence based on Otis's criminal conduct as compared to Cotton's, calling the comparison "apples and oranges." Third, the district court noted that if it sentenced Otis within the Guidelines,

---

[19] The district court later emphasized that Otis's marijuana conviction in 2003 for the 63.5 pounds of marijuana was a factor it considered.

although he was "apparently in good health at this time," "he would be 76 to 78 years old when he got out if he lived that long." The district court explained that this consideration was important because "the older prisoners get, the more expensive they get to house with the medical condition." Based on these considerations, the district judge concluded that the Guideline range did not represent an "appropriate" sentence for Otis:

> I don't think that's an appropriate sentence when I consider the nature and circumstances of the offense and the history and the characteristics of the defendant; when I consider the need for the sentence to reflect the seriousness of the offense; to promote respect for the law; and to provide just punishment for the offense; and to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant.

Accordingly, the district court deviated from the Guideline range and sentenced Otis to 120 months in prison.

### ii. Discussion

Like Trina's sentence, Otis's non-Guidelines sentence is unreasonable because it is based on irrelevant or impermissible factors and because it fails to give sufficient weight to relevant factors. The irrelevant or impermissible factors include:

• Other crimes evidence admitted under FED. R. EVID. 404(b): The district court should not have considered the possible effect on the jury's deliberative process of the court's decision to admit at trial Rule 404(b) evidence of marijuana trafficking by Otis. No aspect of § 3553(a) authorizes the sentencing court to speculate about the effect on the jury's deliberations of certain evidence admitted at trial. Cf. United States v. Meacham, 115 F.3d 1488, 1498 (10th Cir. 1997) (vacating a downward departure sentence based on the district court's concerns that the evidence supporting the conviction was weak

because of witness credibility); United States v. Haut, 107 F.3d 213, 219 (3d Cir. 1997) (concluding that it was inappropriate for the district court to justify its downward departure based on the ground that the witnesses for the prosecution lacked credibility).

• Age: When considering Otis's age as one of the factors for its sentence, the district court failed to acknowledge or reconcile its view with the policy statement in U.S.S.G. § 5H1.1, which provides that age is not ordinarily relevant in determining whether a departure is warranted. Although § 5H1.1 states that age may be a reason to depart downward in a case in which the defendant is elderly and infirm, this cannot be a reason to deviate in this case because the district court found that Otis is "apparently in good health." The district court should have acknowledged § 5H1.1 and explained why the policy statement should not apply in Otis's case. See United States v. Simmons, 470 F.3d 1115, 1131 (5th Cir. 2006) ("Although consideration of age appears not to be per se unreasonable post-Booker . . . a district court should acknowledge [§ 5H1.1] and explain why the prohibited or discouraged factor, as it relates to the defendant, is so extraordinary that the policy statement should not apply.").

The factors that the district court overlooked or did not fully consider include:

• Criminal history and recidivism: The district court failed to acknowledge Otis's propensity for recidivism. While Otis was under indictment in the instant case and on pre-trial release, he committed and was convicted of felony possession of 63.5 pounds of marijuana. The district court should have considered this factor. Cf. Guidry, 462 F.3d at 376-77 (determining that the district court's focus on the defendant's scant criminal history "failed to

acknowledge that Guidry has a history of recidivism in that he was on state parole for a drug conviction at the time of many of the events charged in the indictment"); United States v. Goldsmith, 192 F. App'x 261, 266 (5th Cir. 2006) (unpublished) (finding that the district court failed to give the defendant's criminal history the negative significance it deserved under § 3553(a)(1), in part because of the defendant's potential for recidivism).

• Disparity: Just as it did with Trina's sentence, the district court did not consider that the sentence it imposed upon Otis, which constituted a 54% deviation from the low end of the Guidelines range, would create significant disparity between Otis and other defendants with similar criminal histories convicted of similar offenses. See Guidry, 462 F.3d at 378.

• Culpability: The district court deviated from the Guidelines based in part on Otis's criminal conduct without commenting on the policy statement in U.S.S.G. § 5H1.7, which states that "[a] defendant's role in the offense is relevant in determining the applicable guideline range . . . but is not a basis for departing from that range." In addition to failing to consider the relevant policy statement, the district court's sentence does not account for the seriousness of Otis's offense. The quantity of crack that Otis sold to Stephen Taylor alone (3 kilograms) is twice that required to trigger the maximum offense level of 38. See U.S.S.G. § 2D1.1(c)(1) (providing a maximum offense level of 38 for offenses involving 1.5 kilograms or more of cocaine base). Yet, the 120-month sentence imposed by the district court is commensurate with the Guidelines sentence of someone with an offense level of 30, which is the offense level applicable to a crack cocaine offense involving thirty-five to fifty grams of crack. See id. § 2D1.1(c)(5). In addition, although, as the district court noted, Otis's

culpability compared to Cotton's was "apples and oranges," any disparity between Otis's and Cotton's criminal activities is accounted for by the fact that Cotton faced a mandatory term of life imprisonment and by a Guidelines provision that would have permitted the district court to reduce Otis's offense level based on a finding that Otis played a mitigating role in the offense under U.S.S.G. § 3B1.2. Otis never sought a mitigating role adjustment under § 3B1.2, nor did the district court contemplate giving him one.

Accordingly, the district court's non-Guidelines sentence of 120 months for Otis is unreasonable, and this court therefore vacates and remands for resentencing.

## III. CONCLUSION

For the reasons given above, we AFFIRM the district court's denial of Defendants' new trial motions and denial of a hearing on those motions, and we AFFIRM Otis Jackson's conspiracy conviction. Because we find the sentences of Trina Jackson and Otis Jackson unreasonable under 18 U.S.C. § 3553(a), we VACATE those sentences and REMAND to the district court for resentencing.